# EXHIBIT 3

## DECLARATION UNDER PENALTY OF PERJURY

I, Anne-Marie Sykes, in accordance with 28 U.S.C. Section 1746, make the following statement:

*EFFECTS OF NONDISCLOSURE: Disclosure of information by me is voluntary; however, my failure to respond will result in disposition of the case on the basis of information available.*

*AUTHORITY: The authority to collect the information requested is derived from one or more of the following: Title 5, code of Federal Regulations, Sections 5.2 and 5.3; title 5, United States Code, Sections 1302, 1303, 1304, 3301, and 3302; Executive Order 11478, as amended; Executive Order 10577; and 29 CRF 1614.*

*PURPOSE AND USES: The information supplied will be used as a part of the record in an equal employment opportunity discrimination complaint. The record will be furnished to designees of agencies and departments of the Federal Government in order to resolve the complaint. The record may also be disclosed to any agency of the Federal Government having oversight or review authority with regard to Department of Defense, to Federal intelligence agencies, or to others as may be published in the Federal Register.*

1. Is your name Anne-Marie Sykes?
Yes it is.

2. What is your rank?
I am a Lieutenant Colonel in the Air Force.

3. What is your current position, and approximately how long have you worked in that position?
I am the Deputy to the Commander of the 42 Mission Support Group at Maxwell Air Force Base. I have been in this position since June 2001.

4. What is or was your supervisory relationship to Ms. Bridget Dale?
As the Deputy to the Commander, I have not had any supervisory relationship over Ms. Dale except when I am acting for the Commander, and even then, his authority in personnel matters (civilian or military) does not transfer to me. That authority resides with him and with his boss, the wing commander. However, I am a Services Officer and prior to my arrival at Maxwell, the Services Division was having severe financial and organizational problems. I was brought over from my position in Japan because of my expertise in Services to provide advice and guidance to Maxwell to get its program up and running. When I arrived at Maxwell, I told everyone that I had no authority to rate them or take any other actions; instead, I was here on what they could call a two-year staff assistance visit. My job is to help them.

5. Can you make selections, decide on promotions, propose discipline and/or recommend or decide who should get a performance award?

55

00190

No, I do make any of those decisions. At best, I could make a suggestion, and that suggestion may or may not be accepted.

6. As I understand the record, Ms. Kathy Gutierrez was Ms. Dale's second level supervisor during the time you were the Deputy. Is that correct?
Yes, that is correct, to the best of my knowledge. I believe Maj Marian Scavelli was her direct supervisor.

7. My record seems to show that Mr. Ervin Cox was Ms. Dale's first level supervisor until February 2002, from February 2002 until sometime around July 2002 Major Scavelli was the first-level supervisor, and then Major Wilson became her first level supervisor. Is this information correct?
No, it is not correct. Prior to my arrival in June 2001, Mr. Ervin (Sonnie) Cox had worked at the Deputy in the Services Division; however, that was contrary to regulations. Since the Division Chief (Kathy Gutierrez) was a civilian, the Deputy had to be someone from the military. Prior to my arrival, Maxwell had been notified that this had to change, and Major Scavelli had been brought in. However, within a month after I arrived, I asked who the Deputy to Kathy Gutierrez was and I was told that it was not clear. Sometimes Mr. Cox would seem to act in that position and sometimes Major Scavelli would act in that capacity. Sometimes conflicting guidance was given. I learned that even though Maxwell had been told to replace Mr. Cox with someone from the military, Ms Gutierrez had not submitted the Request for Personnel Action (RPA) necessary to take Mr. Cox out of that job. I had that task accomplished. Therefore, technically, Major Scavelli had been Ms. Dale's first-level supervisor for months before my arrival. Major Scavelli had cross-trained into the Services arena, and she was ultimately replaced by Major Wilson at some point in time after Ms. Dale went on sick leave to have her gastric bypass operation.

8. Ms. Dale indicated that she was 5'3" and she weighted about 350 pounds at the time she worked with you in 2001 and 2002. Is that correct based on your observations?
I do not know what her weight was. I would have assumed she weighed about 200 pounds, but I never thought about it before you asked. I suppose it could have been more. I do not really think about those sorts of things.

9. Ms. Dale indicated that you had problems with Major Scavelli because she was about 15 to 20 pounds overweight. Is that correct?
No, that is wrong. In fact, I tried to help Maj Scavelli with her weight issues. I did have a discussion with Major Scavelli about her weight; however, that discussion was prompted only by the fact that the new Wing Commander expressed through the chain of command to me that Major Scavelli seemed to be overweight. In the military, we have certain weight requirements. I do not like those requirements, but we have them. Based on the Wing Commander's concern, I talked with Major Scavelli about her weight. She told me that she was going through some stressful times, she was on medication for depression and she was having some family problems. She told me that the medicine prescribed caused her to gain weight. I advised Major Scavelli to get her doctor to write her a profile saying that her weight should be excused during the time she was on the medication. So, I did not have problems with her weight, and when someone else had a problem with her weight I

56

00191


suggested a way for her to continue to function without letting her weight interfere with her professional standing.

10. Did Mr. Cox, Major Scavelli or Kathy Gutierrez provide you any negative feedback regarding Ms. Dale?
No, they did not. I did not have any conversations with Mr. Cox. Most of my conversations with Major Scavelli and/or Kathy Gutierrez consisted of me telling them what was wrong with the Services Division. Remember, they had been working in this Services area prior to my arrival. There were problems in Services. Managers were being rewarded despite their organizations not being productive. My job was to bring into the office my expertise in Services, provide extensive advice and guidance, and try to help them become more profitable.

11. With regard to Ms. Dale or Major Scavelli, did you perceive that their weight prevented them from performing any aspect of their job or limited them in any manner outside of work?
This is an insulting question. I do not think in those terms. But, to answer your question, NO, I do not know, believe or perceive that those individuals weight prevented them from doing anything, either at work or away from work. I will note that Ms. Dale was excellent at doing catering type work. She was very active and capable in that area. My problem with her was that she was not as business-oriented as her position as the Business Flight Chief required her to be; I also had problems with her not seeming to be capable of or interested in helping the various managers under her supervision to take tangible actions to improve their operations, nor did she hold them accountable for their lack of success.

12. Ms. Dale indicated that in staff meetings, you would chastise her almost constantly, and while you would occasionally chastise others, no one was constantly chastised as she was. She indicated that of the Flight Chiefs reporting to you, she was the only one with a weight problem. Can you address whether these statements are accurate?
I am a Services Officer. That is my career field. My job as the deputy to the Group Commander is to provide advice and assistance to all the squadrons/divisions within our organization, and Services is one of those. The Services activities are by regulation divided into three areas, known as Category A, B and C, designating the type of funding under which they must operate. Category A activities are taxpayer supported [through the Congressionally appropriated Department of Defense annual budget]. Category B activities receive at least 50% taxpayer supported, and so those organizations need to make a profit to provide the other 50%. Category C activities receive no taxpayer support. Those activities are solely supported by the money earned by those organizations. Category B activities provide services capable of making or losing generally small amounts of money. The profit or loss could vary by $500 to $1000 per month. On the other hand, Category C activities have the potential to make or lose large amounts of money, somewhere in the neighborhood of $5,000 to $25,000 per month. In giving guidance and advice, I placed more emphasis on where the problems were, i.e., in the Category C activities, which under Ms Dale's supervision were at the time losing large sums of money in the majority of her Business Flight activities. Ms. Dale was the Chief of the Business Operations Flight. Air Force requires the MWR Fund to make a 7-14% profit, and the

overwhelming majority of that can only be made by the Business Operations Flight. To my recollection, Maxwell had a little over 1% profit the year prior to my arrival, i.e., they were breaking even, and were on a downward trend. Every employee working for Ms. Dale worked in Category C positions. So, the area to concentrate on to bring up the profit or to reduce the loss to the MWR Fund was in the Category C activities. I did that, and as such, I would agree that my focus would have been on Ms. Dale and her management more than on others.

13. Ms. Dale indicated that you had a positive relationship with Mr. Paul Lewis, the Officer's Club manager. She related that positive relationship to the fact that he was not overweight. Can you address this concern?
I can address this, but this is ridiculous. I have explained why I would have had a number of negative conversations with Ms. Dale. On the other hand, Mr. Lewis was an individual that came into an Officer's Club that was ranked at the bottom of our major commands' Officer's Clubs [out of 13 bases]. Within nine months, he had made it the most profitable. He had stopped a multiple year losing record and turned a profit for the first time, and did it through his own knowledge, hard work, and initiative. Since he took the worst and made it the best, and since my focus was on getting the Services to be more profitable, I did not feel the need to focus much, if any, rehabilitative attention towards Mr. Lewis.

14. Ms. Dale indicated that on numerous occasions, you ignored her as the Business Operations Officer and you would deal directly with her subordinate supervisors. She feels you did this because of her weight. Can you address this?
Yes, I can address this. First, I will repeat that Ms. Dale's weight had nothing to do with any of my actions. Since the Services area deals with money, there are numerous reports and briefings on the money situation that must be made, including a monthly briefing and report delivered to the 3-star general who heads the base. Initially, I would go through Ms. Dale and/or inform her that I was setting up a meeting with someone to discuss a report, to get feedback or to get information for a briefing. Ms. Dale advised me that there was no need for me to include her in every conversation of that nature. Instead, she suggested that I just give her some feedback on what was going on or send her informational copies of email traffic. I did that. I also expected her subordinate managers to back brief her on any discussions they had with me, as it is their responsibility to do.

15. Ms. Dale indicated that around October 2001, Major Scavelli told her that she would be submitted to receive the aware of Senior Manager of the Year, but she did not submit that award because of you. Did Major Scavelli discuss that award with you or did you suggest or recommend that it not be submitted, or approved?
No; she never mentioned the award to me at all that I can recall.

16. Ms. Dale indicated that you harassed her around March 2002 because of her weight by requiring her to work in the kitchen. Can you address that allegation?
I have never harassed Ms. Dale because of her weight. There was a problem at the Golf Course. Even though most of the golf course operations were beginning to be fairly profitable, the kitchen and snack bar operation at the golf course was losing about $1,000 to $5,000 per month, and it was bringing down the profit margin. I talked to Bridget about

58

00193

that problem. She told me that she was making some infrequent visits to the kitchen and she was talking with the staff. I told her that apparently those actions were not getting the job done, as a couple of months of continuing losses were showing. I advised her that she needed to spend whatever time it took in the work area to find out what the problem was. That directive had nothing to do with weight. She was the Business Manager over that activity. There were apparent problems there. It was her job to find out the problem and correct it. I advised her how to fix it (which is what I would have done and which I have had other managers do in their operations at other bases to determine exactly the nature and extent of hard-to-determine problems]. She could take or discount my advice on this as on any other matter, which she frequently did. Why she would have considered this advice differently from any other is unclear to me.

17. Ms. Dale indicated that around April 2002, you influenced or caused Major Scavelli to downgrade her performance evaluation. She alleged that her performance over an extended period of time had been at the exceptional level, and she had always received all nine on the evaluation. However, you caused her to receive some eights because of her weight. Can you address this allegation?
I can address it in several ways. First, as I stated before none of my actions that would have affected Ms. Dale had anything to do with her weight. Secondly, I will note that prior to my arrival there were problems in the Business Operations area because the profit was not what it was supposed to be. There was a situation where individuals were being rewarded, but the production was not there. For example, Ms. Arsenault was losing $10,000 to $15,000 a month at the enlisted club; yet, she received a large increase in pay and no disciplinary or administrative actions to document the problems or to get her to turn her operation around. There did not seem to be any correlation between profit and rewards. People were rated as exceptional regardless of their performance as managers. So, I did place emphasis on making the two correspond. To that extent, I can see that Major Scavelli would be reluctant to rate a person at the top level, when there were problems. However, I never saw nor had any direct input into any civilian ratings made in any of our subordinate units, including the rating Major Scavelli elected to give Ms Dale or any other employee in the Services Division. I was not then and am not now in Ms. Dale's rating chain-of-command, so I neither recommended, reviewed nor approved such ratings.

18. Ms. Dale indicated that in April 2002, you removed her authority over the clubs because you made Paul Lewis the General Manager over all of the clubs. She stated that you made that decision without any prior conversations with her. She feels that this was another action taken because of her weight?
Again, none of my actions had anything to do with Ms. Dale's weight and in this case, I had nothing to do with the action at all. There was a situation with Ms. Arsenault losing so much money. Ms. Dale hired Ms. Arsenault because she was a friend of hers. I had discussions with Ms. Dale about what she was doing about the large losses. She told me that she was harder on Ms. Arsenault that on anyone else. She told me about counseling her and talking to her sternly. I advised her that if there was a problem there should be documentation. Then, if through counseling and documentation it became obvious that the problem was not being corrected then action must be taken based on poor performance.

As I understand it, after those discussion, Ms. Dale, Ms. Gutierrez and Paul Lewis discussed the situation and *they* decided that since Paul Lewis had made the officer's club a profitable organization, he should be made the general manager over the clubs. He would report to Ms. Dale. This was not my decision nor was I involved in those discussions. After the decision was made by that group, I was informed by Ms Dale, Mr Lewis and Ms Gutierrez about the decision in a meeting in my office, when they also informed me that Ms Arsenault would be moved out of the Enlisted Club and allowed to go on leave without pay from that profit-making [nonappropriated funded] job, and would be rehired by Services as a Training Manager in an appropriated [Congressional budget] funded status. I disagreed with that decision in total, but Ms Dale said it was hers and Ms Gutierrez' decision and they in fact implemented it in total. The bottom line is that I did not make the decision about either Arsenault's or Lewis' job position. I was informed of the decision and my opinion was solicited, but only after the facts, and it didn't seem to make any difference one way or another.

19. Ms. Dale indicated that around mid-June 2002, immediately prior to her going on sick leave for her gastric bypass operation, you held a meeting with Paul Lewis, Ms. Langford, and Mr. Norman Logan from the Human Resources Office about the mandatory placement of an employee that won an EEO complaint and had to be mandatorily placed back into her job at the Officer's Club. Ms. Dale alleged that this was another example of where you ignored the fact that she was the Chief of the Business Operations Flight, and dealt directly with her subordinate because of her weight. Can you address this allegation?
Yes, I can address it by first stating that nothing that I did had anything to do with Ms. Dale's weight.

I recall that a Ms. Lee had worked in the officer's club several years earlier. She had been terminated by Mr. Lewis' predecessor with Ms. Dale's concurrence. As I recall it, management thought she was stealing. The administrative judge did not believe the evidence supported the charge, and it was reversed. The 42d Air Base Wing Legal Office and the office of Civilian Equal Employment Opportunity told me that Ms. Lee was to be placed back into the job she left, back under the Officers' Club manager. However, there was a problem because there had been a reorganization and a change in the way business was conducted. Mr. Lewis wanted to discuss those problems and discuss some solutions. As I recall it, Ms. Dale was not at work. She had been out for a gall bladder operation, she had been on leave for personal reasons and she then had a gastric bypass operation. She was not at work at that time. Anyway, Ms Dale's input would not have mattered in this instance. The negotiation was between the Legal Office, Ms Lee's lawyer, and the Service Division as a whole, which Ms Logan represented as the Human Resources officer. She helped relate the number and types of jobs for which Ms Lee would be considered eligible, which carried 3 separate stipulations for employment. Those 3 options were presented to Ms Lee by Legal through Ms Lee's lawyer, one of which she exercised. Since the wrongful firing claim was upheld against Ms Dale and the prior club manager, she was not to have any input into the rehiring action, and in fact was to be sent to mandatory remedial EEO training upon her return to work. I don't know if she ever attended that training. Meanwhile, I taught a Human Dignity class to all the Services managers, military and

civilian alike, with the blessings of the base EEO officer, so that we might help prevent any similar recurrences.

20. Ms. Dale indicated that you stopped her from getting a transfer to Randolph AFB because of her weight. Can you address this contention?
Yes, I can address it by again saying none of my actions towards Ms. Dale had anything to do with her weight. Secondly, I will note that I never stopped Ms. Dale from transferring to Randolph. What I did was stop someone from transferring from Randolph to here. I realize that Ms. Dale was trying to arrange a swap with someone at Randolph and I realize that by rejecting the individual from Randolph that stopped the swap. However, my concern was that I did not want to accept someone in the job that I did not feel could adequately perform the job, and the person presented to us to fill her job had a reputation as a very poor employee from his previous supervisors and I was not willing to replace one incompetent Business Operations Flight Chief with another.

21. Ms. Dale indicated that she felt you stopped her from getting a transfer to England. Can you address this allegation?
I have had nothing to do with a transfer to England. I realize that Ms. Dale wanted to obtain such a transfer. I even told her that I would be glad to write her a letter of recommendation. However, no one ever contacted me about a transfer. So, I have taken no action with regard to any such transfer.

22. While Ms. Dale was on sick leave from June 2002 to December 2002, Major Wilson came in as her supervisor. Did you discuss with Major Wilson any negative information about Ms. Dale, her performance or anything else? Secondly, did you discuss her EEO complaint or mention her EEO complaint to him?
I did none of the above.

23. Ms. Dale indicated that her first realization that you had a problem with her weight took place around June 2002, shortly before her gastric bypass operation. She indicated that you came into a meeting with about twenty individuals. You addressed the group, but you looked directly at her and commented that you were tired of the GS (civilian general schedule employees) sitting around fat, dumb and happy. She indicated that everyone knew she was a heavy person who was happy, and that when you looked directly at her to make your comment that communicated to her that you perceived heavy, happy people as dumb people who cannot do their job. She also indicated that because of all of the stress caused by your with regard to her weight she underwent the gastric bypass operation to lose weight to please you. Can you address these allegations?
I will respond in reverse order. First, I will again state that an individual's weight is not a factor that influences the way that I address, deal with, manage or respond to that person. Secondly, Ms. Dale advised me that she was having the gastric bypass operation because after her gall bladder operation the doctor told her that if she did not take off some of her weight she would not live another ten years. She told me that she wanted to live to retire and enjoy her retirement, so she was undergoing the gastric bypass operation to lose weight. At no point in time, did she "blame" me as a reason for her operation. Instead,

during the conversation about the operation, she told me that she was appreciative of the guidance and assistance I had provided to her.

The latter part of that I will address is the allegation regarding the comment. I would never comment about a "group" of people (i.e., GS employees, civilians, military, enlisted, them, us, etc). It is possible I made a comment about being tired of people being complacent and accepting the way things are without making any obvious attempt to improve mission operations or the state of the MWR Fund. It is, however, not probable that I used the phrase "fat, dumb, and happy". But if I did, it was only to imply people accepting the current broken status quo as acceptable, as their track record demonstrated. Regardless of the wording, I would never refer to any grouping of individuals or categories of people. Any comments I make in reference to employees are directed at behavior on the job and toward mission accomplishment, never toward any particular person's characteristics. Yes, I do discriminate—I do so on the basis that the law, the taxpayers, and my supervisor and subordinates expect, and that is on the basis of merit, solely on performance or lack thereof.

I, Anne-Marie Sykes, state under penalty of perjury that the foregoing is true and correct.

_____                    24 June 2003
(Witness' Signature)                                    (Date)

62

00197