**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF ALABAMA**
**NORTHERN DIVISION**

| | | |
|---|---|---|
| **BRIDGET DALE,** | ] | |
| **Plaintiff,** | ] | |
| | ] | |
| **v.** | ] | **CIVIL ACTION 2:05-CV-1179-T** |
| | ] | |
| **MICHAEL W. WYNNE,** | ] | |
| **SECRETARY OF THE AIR FORCE,** | ] | |
| **Defendant.** | ] | **Date:  January 26, 2007** |

**PLAINTIFF'S BRIEF IN OPPOSITION TO**
**DEFENDANT'S MOTION TO DISMISS OR**
**IN THE ALTERNATIVE FOR SUMMARY JUDGEMENT**

COMES NOW the Plaintiff, Bridget Dale (hereinafter "Ms. Dale" or "Plaintiff Dale"), and pursuant to this Court's Order, dated January 9, 2007, presents, as her Brief in Opposition to Defendant's Motion to Dismiss or in the Alternative, for Summary Judgment, the following:

**FACTS**

1.      Bridget Dale was employed by the United States Air Force for twenty-nine (29) years.  Her last position was as a GS-12, Chief of Business Operations Flight, Services Divisions, Mission Support Group, 42nd Air Base Wing, Maxwell AFB.  She served as Chief of Business Operations Flight for approximately thirteen (13) years and served in that capacity at Maxwell AFB from June 2000, until she resigned her position on June 13, 2003. (Plaintiff's Exhibit (PX) 1, Administrative Record (AR) p. 117, ¶ 2; PX 2 - AR p. 225)

2.      She received performance awards each and every year, until June of 2002. (PX 3)  Her ratings, even until her last appraisal in June 2002, were Acceptable, Fully Successful or better.  (PX 4)  Ms. Dale's appraisals for the preceding eight (8) years were all "8s and 9s," with "9 " being the highest possible rating.  (PX 5 - Appraisals)

3.      In June of 2001, Lt Col Ann Marie Sykes became the Deputy Commander of the 42 Mission Support Group, of which Ms. Dale's flight is a subordinate unit. (Defendant's MSJ, p. 2, ¶ 2)  Almost immediately, Lt Col Sykes began to treat Ms. Dale harshly about her work.  (DX 2 - AR p. 891, ln. 4 - 14)  Although Ms. Dale had an outstanding record for thirteen (13) years as a Chief of Business Operations, she suddenly could do nothing right.

4.      Ms. Dale began to notice that other civil service employees were not treated fairly.  Deborah Arsenault, one of the Maxwell AFB club managers who was overweight, was not paid the same as an average-sized male club manager.  (DX 2 - AR p. 896) Ed Starke, the Maxwell golf course assistant manager, who was overweight, was not promoted to the manager position, even though his management efforts caused the golf course to be profitable for the first time in a long time.  (DX 2 - AR p. 895)

5.      Over time, and after several incidents in which Lt Col Sykes berated her in staff meetings, Ms. Dale came to realize that Lt Col Sykes was singling her out due to her size.  (DX 2 - AR p. 899, ln. 6-13)  Lt Col Sykes treated Ms. Dale less favorably than she treated other civil service employees of the same level who were not overweight.  It should be noted that at the time of the disability-related discriminatory incidents, Ms. Dale weighed over 300 pounds, even though she was only 5' 3" tall.  (DX 2 - AR p. 899, ln. 20 - p. 900, ln. 8; PX 13 - AR 1263, photo 1st person on the left)

6.      On July 26, 2002, Ms. Dale made an informal Complaint of disability (obesity/size) discrimination by Lt Col Ann Marie Sykes.  (PX 6 - AR p. 1, ¶ 3)  Ms. Dale asserted that, at over 300 pounds, she was not limited in her ability to perform in her job or in her private life.  (PX 1 - AR p. 118, ¶ 11, 12)  Ms. Dale's disability Complaint was based

2

on Sykes' regarding Ms. Dale as having a disability because of her size.

7.    Lt Col Sykes singled out Ms. Dale in staff meetings and berated her.  She made comments, such as she was "tired of certain civil service employees sitting around fat, dumb and happy," all the while looking directly at Ms. Dale.  (PX 1 - AR p. 118, ¶ 13 DX 2 - AR p. 898, ln.19 - p. 899 ln. 7)  Sykes initially doubted that she made the comment.  (PX 7 - AR p. 134, ¶ 2)  However, she later testified that she probably made the comment, but it was to explain to her subordinates they should not be complacent.  (DX 2 - AR p. 1151, ln. 10 - 20)  Sykes also testified that normally, when she speaks to someone, she generally makes eye contact with them.  (DX 2 - AR p. 1152, ln. 9-15)  Since Sykes looked directly at Ms. Dale when she made the comment, it was obvious Sykes meant the comment for Ms. Dale.

8.    Lt Col Sykes "suggested" to Ms. Dale that she work in the golf course snack bar kitchen when problems arose regarding monetary losses in that facility.  Lt Col Sykes admitted she merely recommended to Ms. Dale that she work in the golf course snack bar kitchen, but again, blamed her decision on the need to fix financial problems.  Yet Lt Col Sykes did not allow Ms. Dale to decide how to investigate and fix the problem.  (PX 1 - AR p. 120, ¶ 18)  Ms. Dale considered this to be a humiliating and degrading experience, because, as a 29-year veteran, she had remedied such situations in the past.  To Ms. Dale, it was obvious Lt Col Sykes regarded Ms. Dale as unable to do her job.  (PX 7 - AR p. 130, ¶ 16; DX 2 - AR, p. 913, ln. 3 - p. 915, ln. 2)

9.    Lt Col Sykes also undermined Ms. Dale's authority.  Lt Col Sykes would go directly to Ms. Dale's subordinates when she needed information concerning the Business Operations Flight.  Sykes appointed Mr. Paul Lewis, one of Ms. Dale's subordinates, as the

3

Director of Club Operations.  (PX 1 - AR p. 121, ¶ 20; DX 2 - AR p. 1153, ln.3 - p. 1156, ln. 6)  The operations of the Clubs at Maxwell and Gunter Air Force Bases were a major portion of Ms. Dale's responsibilities.  Lt Col Sykes' testimony with regard to this matter was highly suspect.  On the same page of her hearing testimony, Sykes testified she made the decision to make Mr. Lewis the Director of Club Operations and then denied she made that decision. (DX 2 - AR p. 1156, ln. 5 - 20)

10.    Lt Col Sykes also prevented Ms. Dale from transferring to a position at Randolph AFB, Texas, as a swap for an employee at that location.  Lt Col Sykes acknowledged she did not allow the transfer, but made the excuse that the person at Randolph was unacceptable. (DX 2 - AR p. 1168, ln. 6 - 15)  It is interesting to note that Lt Col Sykes referred to Ms. Dale, who had thirteen years as a business flight chief and who always received near-perfect appraisals, as "unsuccessful" and "incompetent." (DX 2 - AR p. 1168, ln. 19 - 23; DX 2 - AR p. 1180, ln. 20 - p. 1181, ln. 1)  Sykes' comment was that she did not want to replace one incompetent business flight chief with another one.  (PX 7 - AR p. 133, ¶ 20)

11.    Lt Col Sykes said Ms. Dale could not train her people.  (DX 2 - AR p. 1181, ln. 17 - 1182 ln. 18) Witnesses Ed Starkie, David Smith, Deb Arsenault, and Major Marian Scavelli testified otherwise.  Mr. Starkie spoke well of Ms. Dale, testifying that she held him and the golf course manager accountable, was in charge of things, was helpful and was present to ensure the golf course ran properly.  (DX 2 - AR p. 784, ln. 13-21)  David Smith, who was a peer flight chief to Ms. Dale, had the opinion that she did a great job.  (DX 2 - AR p. 701, ln. 9 - 12) Ms. Deb Arsenault, a subordinate of Ms. Dale, spoke very highly of her, describing her as "very efficient," always there when needed, good advisor, very

4

knowledgeable and a very good supervisor. Major Scavelli testified that Ms. Dale did a good job, given all of the problems she was expected to handle as a flight chief. (DX 2 - AR p. 818, ln. 19-22) Finally, Ms. Dale's long history of outstanding appraisals attest to her ability to train her employees as well as do her job overall.

12.      Ms. Dale also asserts that she requested a humanitarian transfer back to England, but believes Lt Col Sykes blocked that transfer as well. (PX 1 - AR p. 122, ¶ 23) Lt Col Sykes acknowledges she knew Ms. Dale wanted such a transfer and said she would write a letter for her. Then Sykes denies she was contacted about the transfer or that she took any action to prevent Ms. Dale's transfer to England. (PX 7 - AR p. 133, ¶ 21) Lt Col Sykes has asserted that she may have signed a letter in support of Ms. Dale's transfer to England. If this is so, Ms. Dale was never informed of such support and no such letter has been introduced as evidence in this case.

13.      Ms. Dale came to realize that Lt Col Sykes was treating her in this manner because of her (Ms. Dale's) size. Ms. Dale became desperate to gain Lt Col Sykes' approval and acceptance. She felt that her image with Sykes would improve if she (Ms. Dale) were a smaller person. Therefore, she had a gastric bypass to quickly lose weight, in June of 2002. (DX 1 - Dale Dep., p. 85)

14.      Ms. Dale filed her formal Complaint of discrimination on November 26, 2002. (PX 8 - AR p. 75 - 77) In her Complaint, Ms. Dale alleges discrimination due to her disability (obesity/size). She supplemented her disability claim with a reprisal claim on March 18, 2003. (PX 9 - AR p. 78 - 80)

15.      When Ms. Dale attempted to return to work following her gastric by-pass surgery in January 13, 2003, she found she had been placed under Maj. Matthew Wilson.

5

At their very first meeing Maj. Wilson barely acknowledged her presence and dismissed her until later in the day.  Maj. Wilson also had Ms. Dale's secretary, Janice Stephens, at the later meeting.  During that meeting, Wilson was again very short with Ms. Dale and instructed her not to make any personnel changes for ninety (90) days.  (PX 1 - AR p. 123, ¶ 26; DX 2 - AR p. 730, ln. 2 - 14)  Ms. Dale thought this was extremely unusual treatment she was receiving from Maj. Wilson as she had never had prior dealings with him. (PX 1 - AR p. 123, ¶ 26)

16.    Maj. Wilson denied the meeting was this short.  He testified it was about fifteen (15) minutes long.  Janice Stephens confirmed the brevity of the meeting and also testified that in her opinion, Wilson was "lowering the boom."  She said the meeting was limited to Wilson's order not to make changes.  (DX 2 - AR, p. 730, ln. 2 - 18)

17.    Additionally, Maj. Wilson dealt directly with Ms. Dale's subordinates, namely Lt. Stephanie Clayton and Mr. Paul Lewis.  Ms. Dale, as a senior manager, felt her authority was undermined at having her supervisor bypass her and go directly to her subordinates.  (PX 1 - AR p. 123, ¶ 28; DX 2 - AR p. 800, ln. 20 - p. 801, ln. 15)

18.    Maj. Wilson denied that he communicated to Ms. Dale through her subordinates.  However, he acknowledged that he did communicate through e-mail and that Lt. Clayton was there to assist him in getting the job done while Ms. Dale was on sick leave. (PX 10 - AR p. 139 - 140, ¶ 8)

19.    Maj. Wilson would not allow Ms. Dale to discipline another subordinate, namely Ms. Pam Hutto.  When Ms. Hutto spoke to Ms. Dale in a rude and disrespectful manner, Ms. Dale intended to discipline her for such insubordinate actions, however, Maj. Wilson would not allow her to do so.  (PX 1 -  AR p. 124, ¶ 30; DX 2 - AR p. 926, ln. 7 - p.

6

927, ln. 12 )

20.      Wilson denied limiting Ms. Dale's ability to discipline her subordinates. (PX

1 - AR p. 124, ¶ 30)  Nonetheless, Maj. Wilson admitted Ms. Dale reported the problem to

him and he told her not to punish Hutto, because there was a mistake in the information

Hutto had received, ignoring the fact that Ms. Dale was seeking to discipline Ms. Hutto not

for the mistake but for her manner of addressing Ms. Dale  (PX 10 - AR p. 140-141, ¶11; DX

2 - AR p. 1086, ln. 23 - 1087, ln. 5)

21.      Maj. Wilson testified he did not retaliate against Ms. Dale.  Maj. Wilson first

stated he was not aware of Ms. Dale's EEO Complaint, until she told him about it in late

January 2003.  (PX 10 - AR p. 138, ¶ 4)  However, he also testified it may not have been

until March 2003 when Ms. Dale left work that he learned she had filed a Complaint.  Then

he testified Deb Root may have told him about Dale's EEO Complaint.  (DX 2 - AR p. 1093,

ln. 20 - p. 1094, ln. 8)  Ms. Janet Stephens, Secretary, and Ms. Deb Root, Deputy Chief of

Services Division, both noted that an EEO representative spoke with Maj. Wilson earlier and

may have spoken with him about Ms. Dale's Complaint.  (PX 11 - AR p. 151, ¶ 9; AR p.

154, ¶ 5)

22.      Because Ms. Dale did not know Maj. Wilson until he was moved into the

position over her, the only reason Ms. Dale can think of for his actions toward her is

retaliation for her EEO Complaint.   Ms. Dale became depressed at having to work in a

hostile environment.  She sought the professional counseling services of Pamela Snider,

PhD, Clinical Psychologist. Dr. Snider diagnosed anxiety secondary to thoughts of returning

to the workplace.  (PX 12 - AR pp. 219, 221, 223)  Even though she was cleared by Dr.

Snider to return to work, in May of 2003, Ms. Dale could not handle the harassment and

retaliation she was experiencing.  She submitted a letter of resignation, citing that she was forced to resign because of her supervisors' hostility and discrimination due to their perceptions of her disability.  (PX 2 - AR p. 225)

### LAW
### SUMMARY JUDGMENT

23.     At Summary Judgment, a Court considers the evidence and all inferences drawn therefrom, in the light most favorable to the non-moving party.  *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970*); Hairston v. Gainesville Sun Publishing Co.*, 9 F.3d 913 (11th Cir. 1993)

24.     The Court must reject any effort by a defendant to interpret the facts.  It is not part of the court's function, when deciding a motion for summary judgment, to decide issues of material fact, but rather to decide whether issues exist to be tried.  The Court must avoid weighing conflicting evidence or making credibility determinations.  *Hairston v. Gainsville Sun Publishing Co.,* 9 F. 3d 913, 919 (11th Cir. 1993); *Anderson v. Liberty Lobby*, 477 U.S. 242, 206 S.Ct. 2505 (1986)

25.     The Eleventh Circuit has said, that a grant of summary judgment, though appropriate when evidence of discriminatory intent is totally lacking, is generally unsuitable where the employment discrimination plaintiff has established a prima facie case, because of an elusive factual question of intentional discrimination. *Maddow v. Procter & Gamble Co., Inc.,* 107 F.3d 846, (11th Cir. 1997)

### LAW AND ARGUMENT
### DISABILITY DISCRIMINATION

26.     The Rehabilitation Act of 1973, as amended, 29 U.S.C. §791 et. seq.,

proscribes disability discrimination in the federal sector. Subsection (g) states that the standards used to determine whether this section has been violated in a Complaint alleging non-affirmative action employment discrimination under this section shall be the standards applied under Title I of the Americans with Disabilities Act of 1990.

27.      The Americans with Disabilities Act, 42 U.S.C. §12101 *et. seq,* states, as a general rule, no covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment. 42 U.S.C. §12112(a)

28.      The term "disability" includes, with respect to an individual, a physical or mental impairment that substantially limits one or more of the major life activities of such individual; . . . or being regarded as having such an impairment." 42 USC §12102(2)(a)

29.      One can be regarded as disabled if an impairment is perceived as substantially limiting in the performance of a major life activity, or if one has no impairment but is erroneously perceived as having an impairment which substantially limits a major life activity. 29 C.F.R. §1630.2(l). *Lester v. John Ashcroft*, Department of Justice, Agency. Appeal No. 01A01812 Agency No. P-95-8745 Hearing No. 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X, August 8, 2002

30.      In regard to working, "[w]hen the major life activity under consideration is that of working, the statutory phrase 'substantially limits' requires, at a minimum, that plaintiffs allege they are unable to work in a broad class of jobs." *Sutton v. United Air Lines, Inc.,* 527 U.S. 471, 491, 119 S.Ct. 2139, 2151, 144 L.Ed.2d 450 (1999). Therefore, Plaintiff is "disabled" under the Rehabilitation Act if Lt. Col. Sykes regarded her as substantially

9

limited in her ability to work in a broad class of jobs. *Standard v. A.B.E.L. Services, Inc.*, 161 F.3d 1318, 1327 n. 2 (11th Cir.1998).

31.     Ms. Dale has testified that, even though she weighed over 300 pounds, she was not limited in performing her duties in her position as Business Flight Chief. (PX 1 - AR p. 118, ¶11, 12)  She had previously, for thirteen (13) years, performed in that position and received outstanding or near-perfect appraisals.   (PX-5)  She was never written up or counseled about her performance in the position.  Her outstanding career was truncated by the arrival of Lt Col Ann-Marie Sykes, as the Commander of the Services Division.

32.     Lt Col Sykes regarded Plaintiff as being limited in her ability to perform in her position due to her overweight condition, even though Ms. Dale was not limited in any way due to her physical condition.  The manner in which Sykes treated her shows that Ms. Dale was regarded as being so limited.  Lt Col Sykes singled Ms. Dale out in staff meetings and berated her.

33.     Lt Col Sykes also made the comment that she was tired of certain civil service employees sitting around "fat, dumb and happy," all the while looking at Ms. Dale.  (PX 1 - AR p. 118, ¶ 13; DX 2 - AR, p. 898, ln. 19 - 899, ln. 7)  Sykes initially denied making, but then admitted to making the comment; however, she testified it was to explain to her subordinates that they should not be complacent with the status quo.  (PX 7 - AR, p. 133 - 134, ¶ 23)  Sykes also admitted that when speaking to an employee she generally made eye contact.  (DX 2 - AR p. 1152, ln. 9 - 15)  David Smith, Deb Arsenault and Ms. Dale testified, Sykes was looking at Dale when she made the "fat, dumb and happy" comment.  (DX 2 - AR p. 698, ln. 13 - 699, ln. 12; DX 2 - AR p. 1053, ln. 14 - 1054, ln. 3)  Therefore, by Lt Col Sykes' own admission, her comment was made to Ms. Dale.

34.     Ms. Dale's assertion that she was regarded as having a disability, is supported by the fact that Sykes and/or Ms. Dale's other supervisors appointed Mr. Paul Lewis, a subordinate of Ms. Dale, to be the Operations manager over all three Maxwell AFB Clubs. (PX 7 - AR p. 131 - 132, ¶ 18; DX 2 - AR p. 1156, ln. 5 - 8)  This decision deprived Ms. Dale of much of her authority as Business Flight Chief. (PX 1 - AR p. 121, ¶ 20)  Ms. Dale's supervisors regarded her as being incapable of performing in her position as Business Flight Chief because she was "fat, dumb and happy," even though she has shown she was highly capable for thirteen (13) years.

35.     As further indication of the fact Lt Col Sykes regarded Ms. Dale as being disabled due to her size, Sykes denied Ms. Dale's request for a transfer to Randolph AFB. Lt Col Sykes referred to Ms. Dale as "unsuccessful" as a Business Flight Chief and testified, she (Sykes) "was not willing to replace one incompetent Business Operations Flight Chief with another one." (DX 2 - AR p. 1168, ln. 19 - 23; p. 1180, ln. 20 - p. 1181, ln. 1)  Lt Col Sykes said she did not believe Ms. Dale could train her people.  (DX 2 - AR p. 1181, ln. 17 - 1182 ln. 18)  Sykes' reference to Ms. Dale as "unsuccessful" and "incompetent," after a 29-year career and a string of near-perfect appraisals, is strong evidence of Sykes' discriminatory animus toward Ms. Dale.

36.     Finally, Lt Col Sykes went directly to Ms. Dale's subordinates when she wanted information concerning the Business Operations Flight.  (DX 2 - AR p. 1157, ln. 17 - 22)  This further undermined Ms. Dale's authority and reduced her status as a senior manager.

37.     All of these examples show that Lt Col Sykes considered Ms. Dale to be

unable to perform her job, but also it is very likely she would have considered Ms. Dale to be incapable of performing a range of jobs. Most manager positions require compentency in business management, training employees and communication. Sykes believed Ms. Dale was incompetent in these functions would likely also apply to a range of jobs. Thus, Lt Col Sykes regarded Ms. Dale as disabled with regard to a range of jobs, not just her position as Business Flight Chief. (*id.,* at 1327 n. 2)

38.     The foregoing considered, Ms. Dale can show she that she was regarded by Lt Col Sykes as being disabled. An analysis of Lt Col Sykes' testimony shows she was not truthful when she testified she did not consider Ms. Dale to be more than 20-30 pounds overweight. Any reasonable person would have considered Ms Dale to be overweight, as can easily be seen from her photograph. (PX 13 - AR p. 1263, photo, 1st person on the left) Ms. Dale was over 300 pounds and was only 5 feet 3 inches tall. Clearly, she was obese. Additionally, Lt Col Sykes was, by her own admission, addressing Ms. Dale when she made the "fat, dumb and happy" comment at the staff meeting. (DX 2 - AR p. 1151, ln. 10 - p. 1152, ln. 15) Thus, Ms. Dale has proven she was a member of a protected group as being regarded by Sykes as having a disability due to her size.

39.     Ms. Dale can also show that the actions taken against her were due to her disability or that these actions were pervasive and severe enough to effect the terms and conditions of her employment.

40.     The actions taken against Ms. Dale by Lt Col Sykes:

a.      telling Ms. Dale she was sick and tired of GS employees sitting

around fat, dumb and happy, while looking directly at Ms. Dale;

b.      regularly scolding Ms. Dale in business meetings;

c.      bypassing Ms. Dale by communicating directly with and tasking her subordinates with assignments, thereby undermining her authority;

d.      detailing Ms. Dale to the golf course kitchen, instead of allowing her to decide how to solve the financial problems therein;

e.      placing subordinate Mr. Paul Lewis in a position without "discussing" it with the Ms. Dale;

f.      blocking Ms. Dale's requested transfer to Randolph Air Force Base by denying a swap with another employee, and

g.      referring to Ms. Dale as incompetent, when in fact she had an excellent record as Business Flight Chief for thirteen (13) years.

41.     Ms. Dale testified to the severity of her treatment.  Ms. Dale became so desperate to be accepted by Lt Col Sykes that she had a gastric bypass to quickly lose weight.  (DX 1 - Dale Dep., p. 85)   She previously enjoyed her work, yet under Lt Col Sykes, Ms. Dale became physically ill each day on the way to work.  She became so ill, in fact, she had to seek the services of a psychologist.  Also, as Ms. Dale and Deb Root testified, Ms. Dale was close to suicide and even had suicidal ideations.  (DX 2 - AR p. 862, ln. 2 - 7; DX 2 - AR p. 936, ln. 1 - 10)  Deb Root, who holds a counseling degree, also testified to the effect she observed in Ms. Dale.  Maj. Scavelli also testified to the changes she observed in Ms. Dale after Lt Col Sykes' arrival.  (DX 2 - AR p. 820, ln. 1 - 16)

42.     The foregoing considered, Ms. Dale suffered discrimination because of her

13

size and she was regarded as being disabled by Lt Col Ann Marie Sykes.  There are material issues of fact in this case, namely whether Lt Col Sykes actions toward Ms.Dale were motivated by discriminatory animus toward Ms. Dale because of her size and whether, in the absence of such motivation, she would have treated Ms. Dale in the same manner. Therefore, with regard to Ms. Dale's disability discrimination claim, Defendant's Motion to Dismiss or in the Alternative for Summary Judgment is due to be denied.

**LAW AND ARGUMENT**
**RETALIATION**

43.     According to 42 USC §12203(a), no person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter.

44.     In order to establish a *prima facie* case of discrimination for an allegation of reprisal, Plaintiff must show: (1) that she engaged in prior protected activity, e.g., participated in a discrimination proceeding; (2) that the responsible management official was aware of the protected activity; (3) that she was subsequently disadvantaged by an adverse action; and, (4) that there is a causal link between the protected activity and the adverse employment action. *Hochstadt v. Worcester Foundation for Experimental Biology, Inc*., 425 F. Supp. 318 , 324 (D. Mass), affirmed. 545 F.2d 222 (1st Cir. 1976); see also *Mitchell v. Baldridge,* 759 F.2d 80 , 86 (D.C. Cir. 1985).

45.     The anti-retaliation provision of discrimination law protects an individual not from all retaliation, but from retaliation that produces an injury or harm. Burlington

14

*Northern and Santa Fe Rwy. v. Smith*, 126 S.Ct. 2405, 2414, 2415 (2006)  The anti-retaliation provision, unlike the substantive provision, is not limited to discriminatory actions that affect the terms and conditions of employment.  (*id* at 2413)

46.    The Equal Employment Opportunity Commission has consistently found "retaliatory work assignments" to be a classic and "widely recognized" example of "forbidden retaliation." Equal Employment Opportunity Commission Compliance Manual § 614.7, pp. 614-31 to 614-32 (1991). (*id* at 2416)  In the retaliation context, reassignment of job duties is not automatically actionable. Whether a particular reassignment is materially adverse depends upon the circumstances of the particular case, and should be judged from the perspective of a reasonable person in the plaintiff's position, considering "all the circumstances." (*id* at 2417)

47.    Ms. Dale suffered retaliation/harassment as a result of filing her disability discrimination Complaint.  There is no denial that Ms. Dale filed a Complaint of disability discrimination against the Agency.  Then, in the first meeting between Ms. Dale and Maj. Wilson, on January 13, 2003, Maj. Wilson's actions and attitude toward Ms. Dale were totally unexplainable, absent retaliation.  Ms. Dale had not known Maj. Wilson until he was moved into the position over her.  He did not know her and she had never worked with or for him.  (DX 2 - AR p. 1069, ln. 17 - 19 )  The only reason Ms. Dale can think of for his actions toward her is retaliation for her EEO Complaint.  (PX 1 - AR p. 123, ¶ 26)

48.    While Maj. Wilson denies he was aware of the Complaint before Ms. Dale told him in January 2003, Ms. Janet Stephens, Secretary, and Ms. Deb Root, Deputy Chief of Services Division, both noted that an EEO representative spoke with Maj. Wilson earlier

15

and may have spoken with him about Ms. Dale's Complaint. (PX 11 - AR p. 151, ¶ 9; AR

p. 154, ¶5)  That would have been prior to January 6, 2003, which was prior to the first

meeting Wilson had with Ms. Dale on January 13, 2003. (DX 2 - AR p. 856, ln. 8-22; AR

p. 918, ln. 13-15)

49.    Maj. Wilson was aware of Ms. Dale's EEO Complaint of discrimination. Maj.

Wilson testified Deb Root may have told him about Ms. Dale's Complaint when she, Root,

was made the "token fat person."  Wilson also asserted Ms. Dale told him about the

Complaint when she first met with him. (PX 11 - AR p. 151; ¶ 9; PX 14 - AR p. 154, ¶ 5)

50.    Thus, a causal connection is found as to the retaliatory actions of Maj. Wilson

and the close proximity in time when Maj. Wilson found out about Ms. Dale's  Complaint

of discrimination.

51.    The actions of Maj. Wilson were sufficiently pervasive and adverse to rise

to the level of retaliation.  In her very first meeting with Maj. Wilson, even though Ms. Dale

had never met him, he barely acknowledged her existence. (DX 2 - AR p. 1123, ¶ 26; AR

p. 730, ln. 2 - 14) Then in a meeting later that day, he ordered Ms. Dale not to make changes

at work, a clear indication he was usurping her authority.  Ms. Janet Stephens, Secretary,

whom Wilson directed to attend that meeting, testified Maj. Wilson told Ms. Dale she was

not to make any changes at work and then merely dismissed them. (DX 2 - AR p. 730, ln.

2 - 18)

52.    Maj. Wilson testified that he asked Ms. Stephens to attend the meeting, that

he did Order Ms. Dale not to make changes and that he discussed a variety of subjects to bring Ms. Dale up to speed on activities in her flight during her absence.  (DX 2 - AR p. 1077, ln. 8 - 22)  Ms. Stephens, who had no reason to lie, testified that the Friday prior to Ms. Dale's return to work, Maj. Wilson ordered her to attend his meeting with Ms. Dale. (DX 2 - AR p. 729, ln. 21 - 23)  Stephens was very descriptive about the meeting and testified that Maj. Wilson's direction not to make changes was the only subject of the meeting.  (DX 2 - AR p. 730, ln. 2 - 18)

53.    Even more telling were the conversations Maj. Wilson had with Ms. Deb Root, Deputy Services Division Chief.  An issue arose in which a subordinate, Ms. Hutto, was rude to Ms. Dale on the phone, and Ms. Dale discussed possible disciplinary action with Wilson.  Ms. Root testified Maj. Wilson told her that he told Ms. Dale not to discipline Ms. Hutto, because "a real leader could handle the situation and suck it up." (DX 2 - AR p. 850, ln. 16 - 23)  Ms. Root also testified Maj. Wilson showed her a sign in his office that stated, "Sarcasm, intimidation, and fear are all acceptable leadership traits."  As Maj. Wilson showed her the sign, he said he created it for Ms. Dale.

54.    Major Wilson also told all of Ms. Dale's peer flight managers at a staff meeting that he would be the approving authority for everything that Ms. Dale did.  (DX 2 - AR p. 851, ln. 11 - 17)

55.    Ms. Root also testified Maj. Wilson told her he could not wait to write Ms. Dale's appraisal, indicating he wished to lower her ratings.  (DX 2 - AR p. 857, ln. 1 - p.

17

858, ln. 5)  Even Maj. Wilson testified he wanted to lower Ms. Dale's appraisal ratings, but he was deprived of doing so because he did not have the requisite time as her supervisor to rate her.  (DX 2 - AR p. 1095, ln. 8 - p. 1096, ln. 7)

56.     Finally, after a meeting at which suicide prevention was discussed, Ms. Dale left the meeting in tears and obviously distraught.  Rather than attempting to determine why Ms. Dale was so upset, Maj. Wilson sarcastically commented to Ms. Root, "I guess she'll be out another ten months," or words to that effect.  (DX 2 - AR, p. 860, ln. 9 - 19)

57.     Clearly Maj. Wilson harbored animosity for Ms. Dale and this animosity was completely unfounded; Wilson even testified he did not know her before they first met in January of 2003.  The only reason Ms. Dale can possibly imagine for this animosity was the fact that she filed an EEO Complaint against her supervisors in the Services Division.  In addition to the aforementioned comments and actions by Maj. Wilson, which clearly indicate his animosity toward Ms. Dale, Wilson communicated to Ms. Dale through subordinates, namely Lt. Clayton.  He also circumvented and undermined her authority by, on a regular basis, going for information directly to her subordinates, Mr. Paul Lewis in particular. Normal protocol would have been to use the chain of command and communicate to Lewis through Ms. Dale.

58.     The harassment and retaliation Ms. Dale suffered became more than she could bear.  She sought professional counseling services in an attempt to continue her employment.  When she attempted to return to work, after an extended period of leave, her

18

working conditions did not improve. In fact, her working environment became more hostile as Maj. Wilson undermined her authority. She felt she had no choice but to resign her position with the Agency. (PX 2 - AR p. 225)

59.    Maj. Wilson was aware of Ms. Dale's prior EEO Complaint, according to his testimony and that of two witnesses. Even on his first meeting with Ms. Dale, Wilson began treating her in a demeaning and dismissive manner. Throughout the short time Ms. Dale worked under Wilson, he treated her in a harsh and demeaning manner and undermined her authority. The treatment Ms. Dale received from Maj. Wilson, during the short three months after she returned to work, were because of her discrimination Complaint and were sufficiently severe and pervasive as to effect the terms and conditions of Ms. Dale's employment. She gave her letter of resignation because she was forced to do so in light of the hostile environment in which she was forced to work.

60.    In *Burlington Northern and Santa Fe Rwy Co. v. Smith*, 126 S.Ct. 2405 (2006) the jury found that two of the employer's actions--reassignment of the worker (who was the only female employee in her department) from forklift duty to standard-track-laborer tasks and a 37-day suspension without pay--amounted to retaliation for the worker's filing of claims with the Equal Employment Opportunity Commission.

61.    Major Wilson did the following:

    a.    treated Ms. Dale harshly in his first meeting with her, and thereafter for the three months she worked for him,

    b.    would not allow her to manage her organization,

19

    c.       would not allow her to discipline a subordinate,

    d.       told Ms. Dale's peer managers he would be the approving official for anything Ms. Dale did,

    e.       told another manager he could not wait to write Ms. Dale's appraisal so he could hold her accountable, and

    f.       would not communicate with Ms. Dale or would communicate with her through her subordinates.

62.    The foregoing considered, Ms. Dale suffered retaliation at the hands of Maj. Wilson for filing a Complaint of disability discrimination. There are issues of material fact regarding this discrimination Complaint, namely whether Maj. Wilson knew of Ms. Dale's disability claim before he met Ms. Dale and whether his harsh treatment was in retaliation for Ms. Dale's disability claim. Therefore, this court should deny the Defendant's motion for summary judgment.

## CONSTRUCTIVE DISCHARGE

63.    Ms. Dale's constructive discharge claim was merely the end result of the retaliation against her by the Agency. The Agency was aware Ms. Dale claimed constructive discharge as it received her letter of resignation, in which she claimed she was forced to resign. (PX 2 - AR p. 225) It has also been aware of her claim since the filing of her Complaint and had ample opportunity to seek discovery on this issue. Indeed, the Agency asked Ms. Dale questions about her resignation and the circumstances surrounding her resignation at deposition.

64.    When asked about her resignation, Ms. Dale told the Agency's Counsel she

resigned because she was mentally exhausted and felt totally useless. She was not allowed to do the job she had done for twenty-nine (29) years. Ms. Dale also testified that she was forced to resign because working in a hostile environment was intolerable. (DX 1 - Dale Dep. p. 54, ln. 4-8; DX 1 - Dale Dep. p. 112. ln. 23 - 24)

65.    Even though Ms. Dale attempted to return to work, the harsh treatment she received at the hands of Maj. Wilson, which is noted above, was just too much for her to cope with. Her mental state at that time was too fragile, and any person in Ms. Dale's condition, having been treated in the same manner, would have felt they had no choice but to resign.

66.    The foregoing considered, Ms. Dale was constructively discharged as the unfortunate end result of the retaliation she suffered at the hands of Maj. Wilson for filing a Complaint of disability discrimination.

## **CONCLUSION**

The foregoing considered, the Agency, through its agent Lt Col Ann Marie Sykes, discriminated against Ms. Dale as she was regarded to be disabled due to her size. Additionally, the Agency, through its agent Maj. Matthew Wilson, retaliated against Ms. Dale for filing her Complaint of disability discrimination with the Maxwell EEO office. Finally, Ms. Dale was constructively discharged as she was forced to resign due to the treatment she received from Maj. Wilson in retaliation against her for filing her EEO Complaint. The Defendant's Motion to Dismiss or for Summary Judgment is due to be denied.

Respectfully submitted this the 26th day of January, 2007.

/s/ Joseph C. Guillot
Attorney for Plaintiff


OF COUNSEL:
McPHILLIPS SHINBAUM, L.L.P.
516 South Perry Street
Montgomery, Alabama 36104
(334) 262-1911
(334) 262-2321 FAX

**CERTIFICATE OF SERVICE**

I hereby certify that I have delivered a copy of the foregoing Brief, via the Court's electronic filing system, on this the 26th day of January, 2007, to the following:

Rand Neeley, Esq.
Assistant United States Attorney
201 One Court Square
Montgomery Alabama 36104


/s/ Joseph C. Guillot
OF COUNSEL

22