# PLAINTIFF'S

# EXHIBIT

# 6



**DEPARTMENT OF THE AIR FORCE**
HEADQUARTERS 42D AIR BASE WING (AU)
MAXWELL AIR FORCE BASE ALABAMA

MEMORANDUM FOR:  42 ABW/CCD                    NOV 2 0 2002

FROM:  EEO Manager (Linda P. Long)

SUBJ:  Precomplaint Counseling/Initial and Final Report

1. The following initial report is submitted IAW 36-1201.

2. Complainant:  **Mrs. Bridget E. Dale**
   Position:  **Chief, Business Operations Flight**
   Organization:  **42 ABW Mission Support Group Services Division**
   **60 West Maxwell Boulevard, Bldg 835**
   **Maxwell AFB, Gunter Annex, AL  36112**
   Telephone Duty: **334-953-6971**
   Telephone Home: **334-356-1985**
   Home Address: **1944 Kingsbury Drive**
   **Montgomery, AL 36106**

3. Chronology of EEO Counseling:

   Date of Initial Contact with EEO Counselor:  26 July 2002
   Date of Initial Interview:  4 September 2002
   Date of Alleged Discriminatory Event: 11 June 2002, Ongoing
   45th Day After Event: 26 July 202
   Reason for delayed contact beyond 45 days, if applicable:
   **Complainant was on sick leave from 11 June 2002 to 3 September 2002 and extended**
   **sick leave for severe depression and anxiety from 3 September 2002 to 1 December 2002**
   Date of Final Interview:   20 November 2002
   Date Counseling Report Requested: 20 November 2002
   Date Counseling Report Submitted: 20 November 2002
   Date of Receipt of Formal Complaint Form DD Form 2655: 26 November 2002
   Base Document Number:  MG0J02018

4. Basis(es) for Alleged Discrimination:  **Physical handicap/disability (Obesity)**

   1. Precise Description of the Issues Counseled:

   a.  Was complainant discriminated against and subjected to a hostile work environment based on her **physical handicap/disability (obesity)** when on or about 1 April 2002 her authority was informally removed over the club's and gave to Mr. Paul Lewis, a non-obese employee, yet she was held responsible for the operations of the organization?

00001

# PLAINTIFF'S

# EXHIBIT

# 7

# DECLARATION UNDER PENALTY OF PERJURY

I, Anne-Marie Sykes, in accordance with 28 U.S.C. Section 1746, make the following statement:

*EFFECTS OF NONDISCLOSURE: Disclosure of information by me is voluntary; however, my failure to respond will result in disposition of the case on the basis of information available.*

*AUTHORITY: The authority to collect the information requested is derived from one or more of the following: Title 5, code of Federal Regulations, Sections 5.2 and 5.3; title 5, United States Code, Sections 1302, 1303, 1304, 3301, and 3302; Executive Order 11478, as amended; Executive Order 10577; and 29 CRF 1614.*

*PURPOSE AND USES: The information supplied will be used as a part of the record in an equal employment opportunity discrimination complaint. The record will be furnished to designees of agencies and departments of the Federal Government in order to resolve the complaint. The record may also be disclosed to any agency of the Federal Government having oversight or review authority with regard to Department of Defense, to Federal intelligence agencies, or to others as may be published in the Federal Register.*

1. Is your name Anne-Marie Sykes?
**Yes it is.**

2. What is your rank?
**I am a Lieutenant Colonel in the Air Force.**

3. What is your current position, and approximately how long have you worked in that position?
**I am the Deputy to the Commander of the 42 Mission Support Group at Maxwell Air Force Base. I have been in this position since June 2001.**

4. What is or was your supervisory relationship to Ms. Bridget Dale?
**As the Deputy to the Commander, I have not had any supervisory relationship over Ms. Dale except when I am acting for the Commander, and even then, his authority in personnel matters (civilian or military) does not transfer to me. That authority resides with him and with his boss, the wing commander. However, I am a Services Officer and prior to my arrival at Maxwell, the Services Division was having severe financial and organizational problems. I was brought over from my position in Japan because of my expertise in Services to provide advice and guidance to Maxwell to get its program up and running. When I arrived at Maxwell, I told everyone that I had no authority to rate them or take any other actions; instead, I was here on what they could call a two-year staff assistance visit. My job is to help them.**

5. Can you make selections, decide on promotions, propose discipline and/or recommend or decide who should get a performance award?

55

00127

No, I do make any of those decisions. At best, I could make a suggestion, and that suggestion may or may not be accepted.

6. As I understand the record, Ms. Kathy Gutierrez was Ms. Dale's second level supervisor during the time you were the Deputy. Is that correct?
Yes, that is correct, to the best of my knowledge. I believe Maj Marian Scavelli was her direct supervisor.

7. My record seems to show that Mr. Ervin Cox was Ms. Dale's first level supervisor until February 2002, from February 2002 until sometime around July 2002 Major Scavelli was the first-level supervisor, and then Major Wilson became her first level supervisor. Is this information correct?
No, it is not correct. Prior to my arrival in June 2001, Mr. Ervin (Sonnie) Cox had worked at the Deputy in the Services Division; however, that was contrary to regulations. Since the Division Chief (Kathy Gutierrez) was a civilian, the Deputy had to be someone from the military. Prior to my arrival, Maxwell had been notified that this had to change, and Major Scavelli had been brought in. However, within a month after I arrived, I asked who the Deputy to Kathy Gutierrez was and I was told that it was not clear. Sometimes Mr. Cox would seem to act in that position and sometimes Major Scavelli would act in that capacity. Sometimes conflicting guidance was given. I learned that even though Maxwell had been told to replace Mr. Cox with someone from the military, Ms Gutierrez had not submitted the Request for Personnel Action (RPA) necessary to take Mr. Cox out of that job. I had that task accomplished. Therefore, technically, Major Scavelli had been Ms. Dale's first-level supervisor for months before my arrival. Major Scavelli had cross-trained into the Services arena, and she was ultimately replaced by Major Wilson at some point in time after Ms. Dale went on sick leave to have her gastric bypass operation.

8. Ms. Dale indicated that she was 5'3" and she weighted about 350 pounds at the time she worked with you in 2001 and 2002. Is that correct based on your observations?
I do not know what her weight was. I would have assumed she weighed about 200 pounds, but I never thought about it before you asked. I suppose it could have been more. I do not really think about those sorts of things.

9. Ms. Dale indicated that you had problems with Major Scavelli because she was about 15 to 20 pounds overweight. Is that correct?
No, that is wrong. In fact, I tried to help Maj Scavelli with her weight issues. I did have a discussion with Major Scavelli about her weight; however, that discussion was prompted only by the fact that the new Wing Commander expressed through the chain of command to me that Major Scavelli seemed to be overweight. In the military, we have certain weight requirements. I do not like those requirements, but we have them. Based on the Wing Commander's concern, I talked with Major Scavelli about her weight. She told me that she was going through some stressful times, she was on medication for depression and she was having some family problems. She told me that the medicine prescribed caused her to gain weight. I advised Major Scavelli to get her doctor to write her a profile saying that her weight should be excused during the time she was on the medication. So, I did not have problems with her weight, and when someone else had a problem with her weight I

S6

suggested a way for her to continue to function without letting her weight interfere with her professional standing.

10. Did Mr. Cox, Major Scavelli or Kathy Gutierrez provide you any negative feedback regarding Ms. Dale?
No, they did not. I did not have any conversations with Mr. Cox. Most of my conversations with Major Scavelli and/or Kathy Gutierrez consisted of me telling them what was wrong with the Services Division. Remember, they had been working in this Services area prior to my arrival. There were problems in Services. Managers were being rewarded despite their organizations not being productive. My job was to bring into the office my expertise in Services, provide extensive advice and guidance, and try to help them become more profitable.

11. With regard to Ms. Dale or Major Scavelli, did you perceive that their weight prevented them from performing any aspect of their job or limited them in any manner outside of work?
This is an insulting question. I do not think in those terms. But, to answer your question, NO, I do not know, believe or perceive that those individuals weight prevented them from doing anything, either at work or away from work. I will note that Ms. Dale was excellent at doing catering type work. She was very active and capable in that area. My problem with her was that she was not as business-oriented as her position as the Business Flight Chief required her to be; I also had problems with her not seeming to be capable of or interested in helping the various managers under her supervision to take tangible actions to improve their operations, nor did she hold them accountable for their lack of success.

12. Ms. Dale indicated that in staff meetings, you would chastise her almost constantly, and while you would occasionally chastise others, no one was constantly chastised as she was. She indicated that of the Flight Chiefs reporting to you, she was the only one with a weight problem. Can you address whether these statements are accurate?
I am a Services Officer. That is my career field. My job as the deputy to the Group Commander is to provide advice and assistance to all the squadrons/divisions within our organization, and Services is one of those. The Services activities are by regulation divided into three areas, known as Category A, B and C, designating the type of funding under which they must operate. Category A activities are taxpayer supported [through the Congressionally appropriated Department of Defense annual budget]. Category B activities receive at least 50% taxpayer supported, and so those organizations need to make a profit to provide the other 50%. Category C activities receive no taxpayer support. Those activities are solely supported by the money earned by those organizations. Category B activities provide services capable of making or losing generally small amounts of money. The profit or loss could vary by $500 to $1000 per month. On the other hand, Category C activities have the potential to make or lose large amounts of money, somewhere in the neighborhood of $5,000 to $25,000 per month. In giving guidance and advice, I placed more emphasis on where the problems were, i.e., in the Category C activities, which under Ms Dale's supervision were at the time losing large sums of money in the majority of her Business Flight activities. Ms. Dale was the Chief of the Business Operations Flight. Air Force requires the MWR Fund to make a 7-14% profit, and the

S7

overwhelming majority of that can only be made by the Business Operations Flight. To my recollection, Maxwell had a little over 1% profit the year prior to my arrival, i.e., they were breaking even, and were on a downward trend. Every employee working for Ms. Dale worked in Category C positions. So, the area to concentrate on to bring up the profit or to reduce the loss to the MWR Fund was in the Category C activities. I did that, and as such, I would agree that my focus would have been on Ms. Dale and her management more than on others.

13. Ms. Dale indicated that you had a positive relationship with Mr. Paul Lewis, the Officer's Club manager. She related that positive relationship to the fact that he was not overweight. Can you address this concern?
I can address this, but this is ridiculous. I have explained why I would have had a number of negative conversations with Ms. Dale. On the other hand, Mr. Lewis was an individual that came into an Officer's Club that was ranked at the bottom of our major commands' Officer's Clubs [out of 13 bases]. Within nine months, he had made it the most profitable. He had stopped a multiple year losing record and turned a profit for the first time, and did it through his own knowledge, hard work, and initiative. Since he took the worst and made it the best, and since my focus was on getting the Services to be more profitable, I did not feel the need to focus much, if any, rehabilitative attention towards Mr. Lewis.

14. Ms. Dale indicated that on numerous occasions, you ignored her as the Business Operations Officer and you would deal directly with her subordinate supervisors. She feels you did this because of her weight. Can you address this?
Yes, I can address this. First, I will repeat that Ms. Dale's weight had nothing to do with any of my actions. Since the Services area deals with money, there are numerous reports and briefings on the money situation that must be made, including a monthly briefing and report delivered to the 3-star general who heads the base. Initially, I would go through Ms. Dale and/or inform her that I was setting up a meeting with someone to discuss a report, to get feedback or to get information for a briefing. Ms. Dale advised me that there was no need for me to include her in every conversation of that nature. Instead, she suggested that I just give her some feedback on what was going on or send her informational copies of email traffic. I did that. I also expected her subordinate managers to back brief her on any discussions they had with me, as it is their responsibility to do.

15. Ms. Dale indicated that around October 2001, Major Scavelli told her that she would be submitted to receive the aware of Senior Manager of the Year, but she did not submit that award because of you. Did Major Scavelli discuss that award with you or did you suggest or recommend that it not be submitted, or approved?
No; she never mentioned the award to me at all that I can recall.

16. Ms. Dale indicated that you harassed her around March 2002 because of her weight by requiring her to work in the kitchen. Can you address that allegation?
I have never harassed Ms. Dale because of her weight. There was a problem at the Golf Course. Even though most of the golf course operations were beginning to be fairly profitable, the kitchen and snack bar operation at the golf course was losing about $1,000 to $5,000 per month, and it was bringing down the profit margin. I talked to Bridget about

that problem. She told me that she was making some infrequent visits to the kitchen and she was talking with the staff. I told her that apparently those actions were not getting the job done, as a couple of months of continuing losses were showing. I advised her that she needed to spend whatever time it took in the work area to find out what the problem was. That directive had nothing to do with weight. She was the Business Manager over that activity. There were apparent problems there. It was her job to find out the problem and correct it. I advised her how to fix it [which is what I would have done and which I have had other managers do in their operations at other bases to determine exactly the nature and extent of hard-to-determine problems]. She could take or discount my advice on this as on any other matter, which she frequently did. Why she would have considered this advice differently from any other is unclear to me.

17. Ms. Dale indicated that around April 2002, you influenced or caused Major Scavelli to downgrade her performance evaluation. She alleged that her performance over an extended period of time had been at the exceptional level, and she had always received all nine on the evaluation. However, you caused her to receive some eights because of her weight. Can you address this allegation?

I can address it in several ways. First, as I stated before none of my actions that would have affected Ms. Dale had anything to do with her weight. Secondly, I will note that prior to my arrival there were problems in the Business Operations area because the profit was not what it was supposed to be. There was a situation where individuals were being rewarded, but the production was not there. For example, Ms. Arsenault was losing $10,000 to $15,000 a month at the enlisted club; yet, she received a large increase in pay and no disciplinary or administrative actions to document the problems or to get her to turn her operation around. There did not seem to be any correlation between profit and rewards. People were rated as exceptional regardless of their performance as managers. So, I did place emphasis on making the two correspond. To that extent, I can see that Major Scavelli would be reluctant to rate a person at the top level, when there were problems. However, I never saw nor had any direct input into any civilian ratings made in any of our subordinate units, including the rating Major Scavelli elected to give Ms Dale or any other employee in the Services Division. I was not then and am not now in Ms. Dale's rating chain-of-command, so I neither recommended, reviewed nor approved such ratings.

18. Ms. Dale indicated that in April 2002, you removed her authority over the clubs because you made Paul Lewis the General Manager over all of the clubs. She stated that you made that decision without any prior conversations with her. She feels that this was another action taken because of her weight?

Again, none of my actions had anything to do with Ms. Dale's weight and in this case, I had nothing to do with the action at all. There was a situation with Ms. Arsenault losing so much money. Ms. Dale hired Ms. Arsenault because she was a friend of hers. I had discussions with Ms. Dale about what she was doing about the large losses. She told me that she was harder on Ms. Arsenault that on anyone else. She told me about counseling her and talking to her sternly. I advised her that if there was a problem there should be documentation. Then, if through counseling and documentation it became obvious that the problem was not being corrected then action must be taken based on poor performance.

59

As I understand it, after those discussion, Ms. Dale, Ms. Gutierrez and Paul Lewis discussed the situation and *they* decided that since Paul Lewis had made the officer's club a profitable organization, he should be made the general manager over the clubs. He would report to Ms. Dale. This was not my decision nor was I involved in those discussions. After the decision was made by that group, I was informed by Ms Dale, Mr Lewis and Ms Gutierrez about the decision in a meeting in my office, when they also informed me that Ms Arsenault would be moved out of the Enlisted Club and allowed to go on leave without pay from that profit-making [nonappropriated funded] job, and would be rehired by Services as a Training Manager in an appropriated [Congressional budget] funded status. I disagreed with that decision in total, but Ms Dale said it was hers and Ms Gutierrez' decision and they in fact implemented it in total. The bottom line is that I did not make the decision about either Arsenault's or Lewis' job position. I was informed of the decision and my opinion was solicited, but only after the facts, and it didn't seem to make any difference one way or another.

19. Ms. Dale indicated that around mid-June 2002, immediately prior to her going on sick leave for her gastric bypass operation, you held a meeting with Paul Lewis, Ms. Langford, and Mr. Norman Logan from the Human Resources Office about the mandatory placement of an employee that won an EEO complaint and had to be mandatorily placed back into her job at the Officer's Club. Ms. Dale alleged that this was another example of where you ignored the fact that she was the Chief of the Business Operations Flight, and dealt directly with her subordinate because of her weight. Can you address this allegation?
Yes, I can address it by first stating that nothing that I did had anything to do with Ms. Dale's weight.

I recall that a Ms. Lee had worked in the officer's club several years earlier. She had been terminated by Mr. Lewis' predecessor with Ms. Dale's concurrence. As I recall it, management thought she was stealing. The administrative judge did not believe the evidence supported the charge, and it was reversed. The 42d Air Base Wing Legal Office and the office of Civilian Equal Employment Opportunity told me that Ms. Lee was to be placed back into the job she left, back under the Officers' Club manager. However, there was a problem because there had been a reorganization and a change in the way business was conducted. Mr. Lewis wanted to discuss those problems and discuss some solutions. As I recall it, Ms. Dale was not at work. She had been out for a gall bladder operation, she had been on leave for personal reasons and she then had a gastric bypass operation. She was not at work at that time. Anyway, Ms Dale's input would not have mattered in this instance. The negotiation was between the Legal Office, Ms Lee's lawyer, and the Service Division as a whole, which Ms Logan represented as the Human Resources officer. She helped relate the number and types of jobs for which Ms Lee would be considered eligible, which carried 3 separate stipulations for employment. Those 3 options were presented to Ms Lee by Legal through Ms Lee's lawyer, one of which she exercised. Since the wrongful firing claim was upheld against Ms Dale and the prior club manager, she was not to have any input into the rehiring action, and in fact was to be sent to mandatory remedial EEO training upon her return to work. I don't know if she ever attended that training. Meanwhile, I taught a Human Dignity class to all the Services managers, military and

60

civilian alike, with the blessings of the base EEO officer, so that we might help prevent any similar recurrences.

20. Ms. Dale indicated that you stopped her from getting a transfer to Randolph AFB because of her weight. Can you address this contention?
Yes, I can address it by again saying none of my actions towards Ms. Dale had anything to do with her weight. Secondly, I will note that I never stopped Ms. Dale from transferring to Randolph. What I did was stop someone from transferring from Randolph to here. I realize that Ms. Dale was trying to arrange a swap with someone at Randolph and I realize that by rejecting the individual from Randolph that stopped the swap. However, my concern was that I did not want to accept someone in the job that I did not feel could adequately perform the job, and the person presented to us to fill her job had a reputation as a very poor employee from his previous supervisors and I was not willing to replace one incompetent Business Operations Flight Chief with another.

21. Ms. Dale indicated that she felt you stopped her from getting a transfer to England. Can you address this allegation?
I have had nothing to do with a transfer to England. I realize that Ms. Dale wanted to obtain such a transfer. I even told her that I would be glad to write her a letter of recommendation. However, no one ever contacted me about a transfer. So, I have taken no action with regard to any such transfer.

22. While Ms. Dale was on sick leave from June 2002 to December 2002, Major Wilson came in as her supervisor. Did you discuss with Major Wilson any negative information about Ms. Dale, her performance or anything else? Secondly, did you discuss her EEO complaint or mention her EEO complaint to him?
I did none of the above.

23. Ms. Dale indicated that her first realization that you had a problem with her weight took place around June 2002, shortly before her gastric bypass operation. She indicated that you came into a meeting with about twenty individuals. You addressed the group, but you looked directly at her and commented that you were tired of the GS (civilian general schedule employees) sitting around fat, dumb and happy. She indicated that everyone knew she was a heavy person who was happy, and that when you looked directly at her to make your comment that communicated to her that you perceived heavy, happy people as dumb people who cannot do their job. She also indicated that because of all of the stress caused by your with regard to her weight she underwent the gastric bypass operation to lose weight to please you. Can you address these allegations?
I will respond in reverse order. First, I will again state that an individual's weight is not a factor that influences the way that I address, deal with, manage or respond to that person. Secondly, Ms. Dale advised me that she was having the gastric bypass operation because after her gall bladder operation the doctor told her that if she did not take off some of her weight she would not live another ten years. She told me that she wanted to live to retire and enjoy her retirement, so she was undergoing the gastric bypass operation to lose weight. At no point in time, did she "blame" me as a reason for her operation. Instead,

61

during the conversation about the operation, she told me that she was appreciative of the guidance and assistance I had provided to her.

The latter part of that I will address is the allegation regarding the comment. I would never comment about a "group" of people (i.e., GS employees, civilians, military, enlisted, them, us, etc). It is possible I made a comment about being tired of people being complacent and accepting the way things are without making any obvious attempt to improve mission operations or the state of the MWR Fund. It is, however, not probable that I used the phrase "fat, dumb, and happy". But if I did, it was only to imply people accepting the current broken status quo as acceptable, as their track record demonstrated. Regardless of the wording, I would never refer to any grouping of individuals or categories of people. Any comments I make in reference to employees are directed at behavior on the job and toward mission accomplishment, never toward any particular person's characteristics. Yes, I do discriminate—I do so on the basis that the law, the taxpayers, and my supervisor and subordinates expect, and that is on the basis of merit, solely on performance or lack thereof.

I, Anne-Marie Sykes, state under penalty of perjury that the foregoing is true and correct.

_____          _24 June 2003_
(Witness' Signature)                       (Date)

62

00134

# PLAINTIFF'S

# EXHIBIT

# 8

*QCD Rec'd (pm*

**COMPLAINT OF DISCRIMINATION IN THE FEDERAL GOVERNMENT**
*(This form is subject to the Privacy Act of 1974 - see back)*
*(See back for instructions - Please type or print)*

| FOR AGENCY USE |
|---|
| MEOJO2018 |

**1. FULL NAME OF COMPLAINANT** *(Last, First, Middle Initial)*

Dale, Bridget

**2. TELEPHONE NUMBER** *(Include Area Code)*

**3. ADDRESS** *(Street, City, State, and ZIP Code)*

1944 Kingsbury Drive, Montgomery, AL  36106

**a. HOME**
(334- ) 356-1985

**b. OFFICE**
( 334 ) 953-6971

**4. FEDERAL OFFICE YOU BELIEVE DISCRIMINATED AGAINST YOU**
*(Prepare a separate complaint form for each office which you believe discriminated against you.)*

**5. ARE YOU NOW WORKING FOR THE FEDERAL GOVERNMENT?** *(If answer is "Yes" complete a, b, and c below.)*

☐ YES     ☐ NO

**a. NAME OF OFFICE THAT YOU BELIEVE DISCRIMINATED AGAINST YOU**

Mission Support Group

**a. NAME OF AGENCY WHERE YOU WORK**

United States Air Force

**b. ADDRESS OF OFFICE** *(Street, City, State, and ZIP Code)*

**b. ADDRESS OF YOUR AGENCY** *(Street, City, State, and ZIP Code)*

42 ABW/CCD
50 Lemay South, Bldg 804
Maxwell ABF, AL  36112-6334

**c. NAME AND TITLE OF PERSON(S) YOU BELIEVE DISCRIMINATED AGAINST YOU** *(If you know)*

Lt. Col. Ann Marie Sykes,
Deputy Commander, Mission Support Group

**c. TITLE AND GRADE OF YOUR JOB**

GS-12, Business Activities Flight Chief.

**6. NAME AND ADDRESS** *(Street, City, State, and ZIP Code)* **OF YOUR REPRESENTATIVE** *(If any)*

Joseph C. Guillot
McPhillips, Shinbaun & Gill, LLP
516 South Perry Street
Montgomery, AL  36104

**7. DATE ON WHICH MOST RECENT ALLEGED DISCRIMINATION TOOK PLACE (YYMMDD)**

02/06/10

**8. CHECK BELOW WHY YOU BELIEVE YOU WERE DISCRIMINATED AGAINST**

| | | |
|---|---|---|
| | a. RACE *(If so, state your race)* | |
| | b. COLOR *(If so, state your color)* | |
| | c. RELIGION *(If so, state your religion)* | |
| | d. NATIONAL ORIGIN *(If so, state your natural origin)* | |
| | e. SEX *(If so, state your sex)* | |
| | f. AGE *(If so, state your age)* | |
| X | g. HANDICAP *(If so, state whether mental or physical)* | |
| | h. SEXUAL HARASSMENT *(If so, state your sex and the sex of the person you believe harassed you)* | |

**9. EXPLAIN IN SPECIFICS HOW YOU BELIEVE YOU WERE DISCRIMINATED AGAINST** *(treated differently from other employees or applicants)* **DUE TO YOUR RACE, COLOR, RELIGION, NATIONAL ORIGIN, SEX, AGE, OR HANDICAP** *(For each allegation, please state to the best of your knowledge, information and belief what incident occurred and when the incident occurred. If you need more space, continue on another sheet of paper.)*

See attached affidavit.

**10. I HAVE DISCUSSED MY COMPLAINT WITH AN EQUAL EMPLOYMENT OPPORTUNITY COUNSELOR** *(See instructions)*

☒ YES     ☐ NO

**11. NAME OF COUNSELOR**

Linda Long

**12. STATE CORRECTIVE ACTION YOU ARE SEEKING**

1. Reaccomplish performance appraisal;
2. Humanitarial transfer to UK;
3. Compensatory damages;
4. Attorney fees.

**13. SIGNATURE OF COMPLAINANT**

*1*

**14. DATE OF THIS COMPLAINT (YYMMDD)**

02/11/22  0007

STATE OF ALABAMA                )

COUNTY OF MONTGOMERY      )

## AFFIDAVIT

My name is Bridget Dale and I am over the age of nineteen (19) years. I am a resident of Montgomery County, Alabama. I am a GS-12, Step 7, Appropriated Fund Employee at Maxwell Air Force Base. I presently serve as the Flight Chief of the Business Activities Flight for the 42nd Support Group.

My second-level supervisor, Lt. Col. Ann Marie Sykes, has discriminated against me because of my disability (obesity). Since Lt. Col. Sykes took over as my second-level supervisor approximately one year ago, she has made my life a living hell. She has persecuted me as well as other civil service employee because or our weight.

She does not persecute the Youth Flight Chief who is a GS-12 and she is not heavy. The Youth Flight Chief's name is Elaine Mills.

My work environment has become so hostile because of Lt. Col. Sykes' discrimination against me that for the past six months, I became physically sick each day on the way to work. Because of Lt. Col Sykes, I became so self-conscious about my weight. I believe my weight was the reason for Lt. Col. Sykes' persecuting me and I felt I had no choice but to lose weight immediately to gain her acceptance. Therefore, I sought medical treatment and was referred to a gastric specialist who performed a gastric bypass operation.

Lt. Col. Sykes has circumvented me in contacting my subordinates and tasking them, yet she still holds me accountable for all the actions which she

4

tasks them to perform.  She has also held meetings with my staff to which I have not been invited.  She has also spoken in a disrespectful manner to me in meetings in my presence.  She has eliminated me from the chain of command of my subordinates which has resulted in my becoming totally ineffective in supervising my subordinates.

I also understand that I have been downgraded on my most recent appraisal by Lt. Col. Sykes.  Up until this appraisal period, I have always received perfect grades.  I have not been counseled that my work has been below standard, yet Lt. Col. Sykes has apparently downgraded my appraisal.  Even though appraisals are normally due in April, I still have not received a copy of my appraisal.

The foregoing considered, I believe I have been a victim of discrimination due to disability (obesity).

Dated the ____4th____ day of September, 2002

BRIDGET DALE, Affiant


Sworn to and subscribed before me on this the __4th__ day of September, 2002.


NOTARY PUBLIC

My commission expires: 8-30-2006

S

00077

# PLAINTIFF'S

# EXHIBIT

# 9



# McPhillips, Shinbaum & Gill, L.L.P.

**ATTORNEYS AND COUNSELORS AT LAW**
**516 SOUTH PERRY STREET**
MONTGOMERY, ALABAMA 36104

TELEPHONE (334) 262-1911
FAX (334) 263-2321

March 18, 2003

Julian L. McPhillips, Jr.*
Kenneth Shinbaum
G. William Gill
Mary Goldthwaite

Karen Sampson Rodgers
Aaron J. Luck
James G. Bodin
Joseph C. Guillot

**Mailing Address**
Post Office Box 64
Montgomery, Alabama 36101

*Also Admitted
In New York

Ms. Linda Long
EEO Specialist
42nd Airbase Wing/CCD
Maxwell AFB, AL 36116

      **RE:   *Reprisal Claim of Bridget Dale***

Dear Ms. Long:

At Ms. Dale's request, I am hereby notifying you that she is filing a claim of reprisal against her employer. From the time Ms. Dale has returned to work following her sick leave, she has been placed under Major Wilson. She is the only flight chief to be placed under Major Wilson. He called her into his office immediately upon her return and instructed her that she was not allowed to make any personnel changes. This he did in front of one of her subordinatesHe has also told Ms. Dale that she could not even write up a subordinate. Major Wilson is subverting Ms. Dale's authority at every turn. Major Wilson also has essentially bypassed Ms. Dale in dealing with her subordinates. Her subordinate, namely Paul Lewis, is allowed to go directly to Major Wilson without even so much as contacting her first. Major Wilson also goes through Lt. Stephanie Clayton, Ms. Dale's subordinate, to communicate with Ms. Dale.

Ms. Dale notes she has a witness to Major Wilson's reprisal against her. Ms. Deb Root noted to Ms. Dale that Major Wilson's actions in writing her up for miniscule reasons was in reprisal for Ms. Dale's EEO activity. Major Wilson has also commented, in Ms. Root's presence, that he could not wait until appraisal time. Ms. Dale also overheard Major Wilson telling Colonel Weaver he was going to place Ms. Dale at the Falcon's Nest as a club manager, a significant demotion for Ms. Dale.

Therefore, Ms. Dale wishes to amend her claim to include a reprisal complaint. If you have any questions regarding this matter, please give me a call. I look forward to hearing from you.

Sincerely,

Joseph C. Guillot

JCG/slk

6

00078

*CCD Rec'd    am*

# McPhillips, Shinbaum & Gill, L.L.P.

**ATTORNEYS AND COUNSELORS AT LAW**
**516 SOUTH PERRY STREET**
**MONTGOMERY, ALABAMA 36104**

TELEPHONE (334) 262-1911
FAX (334) 263-2321

Julian L. McPhillips, Jr.*
Kenneth Shinbaum
G. William Gill
Mary Goldthwaite

Karen Sampson Rodgers
Aaron J. Luck
James G. Bodin
Joseph C. Guillot

Mailing Address
Post Office Box 64
Montgomery, Alabama 36101

*Also Admitted
In New York

March 31, 2003

Ms. Linda Long
EEO Specialist
42nd Airbase Wing/CCD
Maxwell AFB, AL 36116

    ***RE:   Reprisal Claim of Bridget Dale***

Dear Ms. Long:

    Enclosed is Ms. Dale's signed amended complaint.   We look forward to receiving the informal investigation materials from you at your earliest convenience.

                                     Sincerely,

                                     Joseph C. Guillot

JCG

7

00079

**INFORMAL COMPLAINT**
**Bridgett Dale**
**GS-0301-12, Chief, Business Operations Flight**
**11 September 2002**
**42 ABW/MSG Services Division**
**Base Docket #: MG0J02018**

**Amended Issue: 28 March 2003**

**7.** Was Complainant subjected to continuous harassment creating a hostile work environment since 13 January 2003 based on Reprisal (prior EEO activity) when her supervisor, Major Matthew G. Wilson, Acting Chief of 42 ABW Services Division, Maxwell AFB, AL, allegedly told her, in the presence of a subordinate, "that she (Complainant) could not make any personnel changes"; would not allow Complainant to discipline an employee for insubordination on 18 March 2003; and constantly humiliated and undermined Complainant's authority to manage her employees?

_____
Signature

3/31/03
Date

8

# PLAINTIFF'S

# EXHIBIT

# 10

JUN-28-03 02:06 AM

## DECLARATION UNDER PENALTY OF PERJURY

I, Matthew Wilson, in accordance with 28 U.S.C. Section 1746, make the following statement:

*EFFECTS OF NONDISCLOSURE: Disclosure of information by me is voluntary; however, my failure to respond will result in disposition of the case on the basis of information available.*

*AUTHORITY: The authority to collect the information requested is derived from one or more of the following: Title 5, code of Federal Regulations, Sections 5.2 and 5.3; title 5, United States Code, Sections 1302, 1303, 1304, 3301, and 3302; Executive Order 11478, as amended: Executive Order 10577; and 29 CRF 1614.*

*PURPOSE AND USES: The information supplied will be used as a part of the record in an equal employment opportunity discrimination complaint. The record will be furnished to designees of agencies and departments of the Federal Government in order to resolve the complaint. The record may also be disclosed to any agency of the Federal Government having oversight or review authority with regard to Department of Defense, to Federal intelligence agencies, or to others as may be published in the Federal Register.*

1. Is your name Matthew Wilson?
**Yes it is.**

2. What is your rank?
**I am a Major in the U.S. Air Force.**

3. As I understand the record, some time after June 2002, you became the Deputy to the Chief of Services Division. Is that correct, and if so, was that the first time you worked in the Services Division?
**That is partially correct. Around October 2002, I came into the Services Division to work as the Chief of the Business Operations Flight in Ms. Bridget Dale's absence. I worked in that position until Ms. Dale came back to work around mid-January 2003. Just a few days prior to her arrival back at work, I became the Deputy to the Chief of Services Division.**

4. Prior to you coming into the Services Division, Ms. Dale filed an EEO complaint that concerned LtCol Sykes. Were you aware of that complaint, and if so, when did you become aware of the complaint? Also, did LtCol Sykes tell you about that complaint and were you aware of any details about the complaint?
**I became aware of the fact that there had been an EEO complaint during a closed door meeting with Ms. Dale around late January 2003. I was having that meeting because Ms. Dale had told another Flight Chief that she was nervous around me because she thought I was documenting a case against her so she could be fired. I wanted to communicate to her**

*66*

00138

that I am not against her and I am not trying to fire her. During that meeting, she stated something like: "You know I have filed an EEO complaint". I informed her that I was unaware of any complaint prior to her just telling me. She then commented that her complaint was filed for the good of the service.

To respond to your other questions, I will note that prior to Ms. Dale communicating that she had filed an EEO complaint neither LtCol Sykes nor anyone else had ever communicated that information to me.

5. Ms. Dale has alleged that her first day back at work in January 2003, she came to your office to introduce herself, and without even looking up or acknowledging her, you dismissed her and told her you would talk with her later. Can you address the accuracy of this statement?
That statement is false. I recall that when she returned to work, she came into my office and we had a discussion with her sitting in my office. I welcomed her and told her how glad I was to meet her. She expressed a desire to teach people about the extensive business knowledge she had. Then, a little later, she came back to my office with her secretary. During that subsequent meeting we discussed more specifics about what had been going on in the Business Flight Chief position while she was away.

6. Ms. Dale indicated that there was a second meeting because you directed her secretary to bring her to your office, and you asked the secretary to remain in the meeting and to take notes of the meeting. Can you address this contention?
This statement is somewhat false. As I stated above, Ms. Dale brought her secretary into the second meeting. I recall the meeting to be an update on the business flight current events. Since Janice had been the secretary for the business flight the entire time I was assigned as flight chief, I felt her presence would be helpful. The intent was to make sure that everyone was on the same sheet of music. I did not order her to take notes. This allegation implies that I needed a witness; that was not the intent.

7. Ms. Dale alleged that during the second meeting you were short with her; you merely advised her that she was to make no changes in the organization and then you dismissed her. Can you address that contention?
That contention is also false. During that second meeting we discussed several aspects of work. I did tell her that in the Club System we had recently gone through some Business Based Actions (BBAs), and that there should be no changes in the clubs until after 90 days. The financial reasoning for the BBAs needed to result in financial savings. I did not say anything to Ms. Dale about what she could do, on personnel matters, with the other activities, besides the club system.

8. Ms. Dale alleged that after that meeting, you would rarely talk with her. Instead, you would just send her e-mails. Then, later when Lieutenant Stephanie Clayton came in as her subordinate, you would only talk with Lt. Clayton. In effect, she indicated she had to

communicate with you through Lt. Clayton. Can you address these allegations?
I do communicate via e-mail; however, I did not limit my communication with Ms. Dale to
e-mail. I treated her in a similar fashion as I treated others. I did not direct my
communications through Lt. Clayton; although I must add that Lt. Clayton was there to
help because Ms. Dale had been out of work for about six months, and her job is a high-
pressure job to just walk right back into. Also, I recall several instances when I had said
hello or good morning to Ms. Dale and she would look down and ignore me.

9. Ms. Dale alleged that you had written her up for miniscule reasons to get rid of her. Can you
address that allegation?
Ms. Dale only worked for me for about two months (mid-January 2003 until March 2003).
During that period of time, I never wrote her up for anything. Her employee record (971
form) has nothing in it. I have never given her a letter of warning or any other letter. I
will add that shortly before she left on sick leave in March 2003, I had received about four
complaints about a variety of things from four individuals. I informed those employees to
confront Ms. Dale about their concerns and if she could not handle them then bring them
to me. I recall that Pat Goodwin did confront Ms. Dale and she brought her problem to
me. I was in the process of scheduling a meeting with Ms. Dale to address that concern.
Also, Mr. Paul Lewis complained that Ms. Dale was dumping all of her work on him
regarding an upcoming Organization Readiness Inspection (ORI). Ms. Pam Hutto
expressed problems she was having with Ms. Dale being rude to her. Last of all, Ms.
Deborah Root complained about Ms. Dale's demeanor when she talked to her about a
photo session. However, Ms. Dale went on sick leave and none of those complaints were
"written up" and given to Ms. Dale.

10. Ms. Dale indicated that her performance evaluation was due in March 2003 and you did not
give her a rating. Can you address that?
I initially thought that I would be rating Ms. Dale, and I even sat in on one of her staff
meetings to help provide information for that rating. However, as I indicated above, Ms.
Dale only worked for me for about two months. I was later informed that in order to rate
an employee's performance, as a supervisor, the employee must work for the rating
supervisor for a minimum of 90-days. Since Ms. Dale did not work for me for at least 90
days, I understood that Ms. Kathie Gutierrez, the Division Chief, was to do the
performance evaluation, which to the best of my knowledge, she completed.

11. Ms. Dale also alleged that when she had a problem with Ms. Pam Hutto not showing up at a
meeting, and had trouble with Ms. Hutto being rude and disrespectful, you directed that she not
take any action against Ms. Hutto. Can you address that contention?
That is not exactly what happened. Ms. Hutto did report to me that she had some problem
with Ms. Dale being rude to her because she missed a meeting. However, she then
discussed how someone mislead her into thinking the meeting was at another time, but that
Ms. Dale would not accept that explanation. Ms. Dale told me that Ms. Hutto did not come
to the meeting, and she did not accept the explanation because Ms. Hutto should have

00140

JUN-28-03 02:07 AM                                                                    P.05

called her if she had any misunderstanding about the meeting since the two of them had just talked about the meeting the day before the meeting. Ms. Dale also explained that Ms. Hutto had been loud on the phone and had hung up the phone on her. My part in all of this was to tell Ms. Dale not to punish Ms. Hutto for missing the meeting because it was a mistake. I never said she could not take action based on the disrespectful behavior. In regards to Ms Dale rendering disciplinary action, I said, "That's your call."

I, Matthew Wilson, state under penalty of perjury that the foregoing is true and correct.

(Witness' Signature)                                    27 JUN 03
                                                        (Date)

69

00141

# PLAINTIFF'S

# EXHIBIT

# 11



## DECLARATION UNDER PENALTY OF PERJURY

I, Janice Stephens, in accordance with 28 U.S.C. Section 1746, make the following statement:

*EFFECTS OF NONDISCLOSURE: Disclosure of information by me is voluntary; however, my failure to respond will result in disposition of the case on the basis of information available.*

*AUTHORITY: The authority to collect the information requested is derived from one or more of the following: Title 5, code of Federal Regulations, Sections 5.2 and 5.3; title 5, United States Code, Sections 1302, 1303, 1304, 3301, and 3302; Executive Order 11478, as amended: Executive Order 10577; and 29 CRF 1614.*

*PURPOSE AND USES: The information supplied will be used as a part of the record in an equal employment opportunity discrimination complaint. The record will be furnished to designees of agencies and departments of the Federal Government in order to resolve the complaint. The record may also be disclosed to any agency of the Federal Government having oversight or review authority with regard to Department of Defense, to Federal intelligence agencies, or to others as may be published in the Federal Register.*

1. Is your name Janice Stephens?
**Yes it is.**

2. As I understand it, at some point in time in the past, you worked as the Secretary at the Business Operations Office, in the Services Division. Is that correct, and if so, when did you work in that position?
**I worked in the position from some time in February 2002 until February 2003.**

3. So, you were already in that job when Major Wilson came in to work in the Business Operations Office.
**Yes, I was. Major Wilson did not come into the office until around October or November 2002.**

4. I have been told that sometime after Ms. Dale returned from sick leave in January 2003, that there was a meeting that you, Ms. Dale and Major Wilson were present in. Do you recall there being such a meeting?
**Yes, I do recall that meeting. I believe the meeting took place the first thing in the morning on the first day that Ms. Dale returned. I believe that when I arrived at work, Ms. Dale was already in his office and I went into the office because I had been told that I was to be in the meeting. As I recall it, Ms. Dale returned to work on January 13, 2003.**

78

5. Do you recall why you would have been in the meeting?
No, I do not recall. Since Ms. Dale had been on sick leave I would doubt that she called me and told me to be there. I would guess that Major Wilson must have told me before hand that he was having a meeting and he wanted me in the meeting.

6. Do you recall whether that meeting was a general discussion about business?
As I recall it, it was a very short meeting in which Major Wilson told Ms. Dale that she was not to make any changes in the organization for at least 90 days. As I recall it, there was no general discussion; he merely passed on his message and the meeting was over with.

7. Did he keep notes of the meeting or have it recorded in any way?
No, he did not take any notes in the meeting and he did not ask me to take any notes. He also did not record the meeting.

8. Why do you think Major Wilson wanted you in the meeting?
I guess he wanted me to be a witness to say he told Ms. Dale not to make changes just in case Ms. Dale did make changes.

9. Were you aware that Ms. Dale had filed an EEO complaint while she was out on sick leave and/or do you know if Major Wilson was aware that such a complaint had been filed?
I recall that prior to Ms. Dale coming back to work; someone from the EEO Office came to the office to talk with Major Wilson. I do not know if that visit concerned Ms. Dale, but for some reason I had the opinion that it did concern her. So, based on my belief of those circumstances I would guess that Major Wilson was aware that there had been an EEO complaint.

I, Janice Stephens, state under penalty of perjury that the foregoing is true and correct.

_____          _____
(Witness' Signature)                      (Date)

# PLAINTIFF'S

# EXHIBIT

# 12

# PAMELA R. SNIDER Ph.D.

Clinical Psychologist

4145 CARMICHAEL ROAD SUITE 202
MONTGOMERY, ALABAMA 36106
(334) 273-2280  •  FAX (334) 273-2375

August 29, 2002

To Whom It May Concern:

Mrs. Bridgete Dale was seen today to begin an initial evaluation.  I have recommended that she not return to work until that evaluation is completed.

*Pam Snider*

Pam Snider, Ph.D.
Licensed Psychologist

# PAMELA R. SNIDER Ph.D.

### Clinical Psychologist

4145 CARMICHAEL ROAD SUITE 202
MONTGOMERY, ALABAMA 36106
(334) 273-2280 • FAX (334) 273-2375

October 30, 2002

Re: Bridget E. Dale

To Whom It May Concern:

Mrs. Dale was seen by me for an initial intake on 8/29/02. I am currently seeing her on a bi-weekly basis and Dr. Brian Elrod has been handling her medication.

She is scheduled to be seen again for her next appointment 11/12/02. At the present time, she reports that returning to work would be too stressful for her. She has described accompanying anxiety secondary to thoughts of returning to the work place.

Please let me know if any further information would be helpful to you.

*Pamela R. Snider*

Pamela R. Snider, PhD
Licensed Psychologist

00221

# PAMELA R. SNIDER Ph.D.

Clinical Psychologist

4145 CARMICHAEL ROAD SUITE 202
MONTGOMERY, ALABAMA 36106
(334) 273-2280 • FAX (334) 273-2375

November 26, 2002

To Whom It May Concern:

Re:  Bridget Dale

Mrs. Dale contacted my office today to inform me that she is no longer feeling anxious about returning to work and feels as though she can return to work beginning December 1, 2002. She is scheduled for a follow up appointment with me next week. The information in this letter is based on her telephone call to me regarding an improvement in her psychological status.

Sincerely,

Pamela R. Snider

Pamela Snider, PhD
Licensed Psychologist

# PLAINTIFF'S

# EXHIBIT

# 13



C1-3

EXHIBIT

# PLAINTIFF'S

# EXHIBIT

# 14

# DECLARATION UNDER PENALTY OF PERJURY

I, Deborah Root, in accordance with 28 U.S.C. Section 1746, make the following statement:

*EFFECTS OF NONDISCLOSURE: Disclosure of information by me is voluntary; however, my failure to respond will result in disposition of the case on the basis of information available.*

*AUTHORITY: The authority to collect the information requested is derived from one or more of the following: Title 5, code of Federal Regulations, Sections 5.2 and 5.3; title 5, United States Code, Sections 1302, 1303, 1304, 3301, and 3302; Executive Order 11478, as amended: Executive Order 10577; and 29 CRF 1614.*

*PURPOSE AND USES: The information supplied will be used as a part of the record in an equal employment opportunity discrimination complaint. The record will be furnished to designees of agencies and departments of the Federal Government in order to resolve the complaint. The record may also be disclosed to any agency of the Federal Government having oversight or review authority with regard to Department of Defense, to Federal intelligence agencies, or to others as may be published in the Federal Register.*

1. Is your name Deborah Root?
Yes it is.

2. Can you tell me what period of time(s) that you worked in the same organization as Major Wilson and Ms. Bridget Dale?
From June 2002 until February 24, 2003, I served as the Deputy to the Commander for Services. When I arrived into that position, Ms. Dale was assigned as the Chief of Business Operations Flight; however, she had been on sick leave for several months before my arrival. In October 2002, Major Wilson came in to work in Ms. Dale's position as Chief of Business Operations Flight. He remained in the position until Ms. Dale returned to work in early January 2003. When Ms. Dale returned to work in January 2003, I was not at work because I took off from work on sick leave in late December 2002. I did not return to the office until the end of February 2003. Thus, I worked with Major Wilson from October 2002 until I left on sick leave in December 2002. I then worked in the office with both Major Wilson and Ms. Dale from the end of February until the middle of March when Ms. Dale again went on sick leave. She was on leave several of the days during that time. I would estimate that I worked with her approximately 13 working days.

3. Ms. Dale reported that you told her that you had heard Major Wilson say things that would hurt her feelings and you told her that you did not think things were being handled properly with regard to her. Can you recall making those types of comments to Ms. Dale, and if so, did the comments that you referenced concern either Ms. Dale's weight or her EEO complaint?
I recall that during a meeting a few days before Ms. Dale went back on sick leave we were in a briefing when Ms. Dale left the briefing in tears. The briefing included a guest speaker from our mental health clinic on suicide prevention. She was noticeably upset, stressed and

00153

incoherent. Since I am by trade a professional counselor (and the suicide prevention monitor for the division), I left the meeting to talk with Ms. Dale and find out what the problem was. Ms. Dale told me that she did not think any body liked her, and she made broad comments about Major Wilson and others doing things that bothered her, and watching everything she did. She told me that went she first returned to work she was immediately called in by Maj Wilson and one of her subordinates, Ms. Stephens, was called in and she was told that she had no authority to make decisions, that she was being watched for errors, and that everything she did had to be approved in advance by him. She was also advised that he was her direct supervisor, a deviation from all other flight chiefs at the time. She asked if I knew what was going on, I acknowledged that I had heard some rumors that would bother her and preferred not to repeat them. I did tell her that the rumors circulating did involve comments alleged to have been made by Maj Wilson about Ms Dale and her "failure to perform the job" and his desire to "figure out how to hold her accountable". None of the comments concerned her weight nor was there any reference to any EEO complaint.

4. Ms. Dale indicated that you told her that Major Wilson told you even before she came back that he could not wait to do her performance evaluation. Can you recall that conversation? I recall that Major Wilson at some point in time asked when he was suppose to do performance evaluations. Major Wilson was new at supervising civilian employees and had never been to supervisor's school. I told him that the rating periods ended in March. Major Wilson did not make the comment in a negative manner; he merely made a comment about wanting to know when he was to do the rating. He did state that he looked forward to the opportunity to hold her accountable for things that had been written about her failure to do the job right as reported by our command staff in a report by Mr. Tom Maxwell.

COMMENT: I want to note that during the earlier investigation by the EEO Office, Ms. Dale mentioned that I was overweight and I should be a witness to verify that over weight people are mistreated. I actually resented her telling someone that I felt that way. felt that was discriminating on her part. When talking to the EEO counselor, I stated firmly that I feel the exact opposite. I feel that I have been given multiple opportunities and given positions of top responsibility thought the 42 Air Base Wing, I have always felt that management in the Wing only had one concern, and that was a concern about my ability to perform and do a good job. In fact, I am the only civilian ever allowed to stand in as the Deputy Group Commander—a military position This speaks volumes since the military have a weight standard that I exceed (greatly) and yet I was selected—obviously my performance was the measurement standard.

5. Do you know if Major Wilson was aware that Ms. Dale had filed an EEO complaint? While I never heard him say anything about the complaint directly, I do know that he commented that there were "problems/issues" between Ms. Dale, Lt Col Sykes, and Mr. Paul Lewis—I don't know what his level of understanding was. I do seem to recall that when the enlisted club manager filed a complaint someone from the EEO Office came over and talked with Major Wilson. I believe at that time, Major Wilson was told about Ms. Dale's complaint.

82

6. **Do you know of any other situations that occurred between Ms. Dale and Maj Wilson? Please be specific if they are related to this complaint.**

While I do not know of any situations related to weight or in which specific EEO items were addressed, I can recall several scenarios in which conflict occurred. In each situation, Maj Wilson was the dominant personality, at some time aggressively speaking with very strong mannerisms/gestures. I never observed Ms. Dale being rude, confrontational, or in any way inappropriate—she was far too depressed. I recall specifically a situation in which I observed Ms. Dale very emotional after a confrontation with the Gunter Bowling manager. Later the same day, Maj Wilson, told me that Ms. Dale had come to him asking for approval to send a letter of reprimand to Ms. Hutto (Bowling Manager) for insubordination and that he had told her "no" and that "a real leader could handle this situation, suck it up".

I also recall that as the Division prepared for a major inspection, all other flight chiefs were given specific tasking and authority to carry them out. All taskings for the Business Flight were given to Ms. Dale but all authority/approval levels for them was diverted to Maj Wilson.

On another occasion he took me into his office to show me a sign he had created "for" Ms. Dale. It was hanging on his wall and read, "Sarcasm, intimidation, and fear are all acceptable leadership traits". Later he told me he had heard that saying from the MSG/CC.

On the day Ms. Dale left the briefing in tears, Maj Wilson asked me "what was her problem—can't she handle the stress." I also heard him make the comment in the command section "I guess she'll be going on leave for another 10 months". I didn't consider his behavior to be one of concern for his employee.

I, Deborah Root, state under penalty of perjury that the foregoing is true and correct.

_Deborah Root_
(Witness' Signature)

_Sept 12 2003_
(Date)

83

00155