## IN THE DISTRICT COURT OF THE UNITED STATES
## FOR THE MIDDLE DISTRICT OF ALABAMA
## NORTHERN DIVISION

| | |
|---|---|
| BRIDGET DALE, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Civil Action No.:**2:05-CV-1179-MHT** |
| | ) |
| MICHAEL W. WYNNE, | ) |
| SECRETARY OF THE AIR FORCE, | ) |
| | ) |
| Defendant. | ) |

## MEMORANDUM IN SUPPORT OF DEFENDANT'S
## MOTION FOR SUMMARY JUDGMENT

The Federal Defendant, Michael W. Wynne, Secretary of the Air Force, through

undersigned counsel and pursuant to Rule 56 of the Federal Rules of Civil Procedure,

submits this memorandum in support of his Motion for Summary Judgment.

## I.     SUMMARY OF ARGUMENT

Defendant moves for Summary Judgment because Plaintiff cannot show she is, or

was, regarded as a qualified individual with a disability who, with or without

accommodation, can perform the essential functions of her job; she cannot show that the

treatment she alleges on the part of agency officials, even if true, would amount to a

hostile work environment or constructive discharge and because Plaintiff has not

administratively exhausted her claims of constructive discharge.

## II.     STATEMENT OF UNDISPUTED FACTS

In June 2000, Plaintiff began employment as the Chief of Business Operations flight, Services Division (GS-301-12), Mission Support Group. 42nd Air Base Wing, Maxwell AFB, AL.  (Dale Depo, 12, lines 16-20)  Plaintiff's duties were to supervise the managers of seven Non-Appropriated Fund (NAF) activities at Maxwell AFB:  the Officer's Club, the Enlisted Club, the Falcon's Nest, the Golf Course, two Bowling Centers, and a Veterinary Clinic.  (Dale Depo, 12 lines 24-25; 13 lines 1-5).  All the activities supervised by Plaintiff were Category C NAF activities which did not receive any appropriated funds or tax payer dollars.  All of these activities were required to make a profit in order to be self-sufficient and pay salaries of the activity employees, utilities, and cover other operating expenses.  Further, the money that these activities were supposed to generate was needed to support other base activities and the base Morale Welfare and Recreation fund.  (Dale Depo 33 line 25; 35 lines 1-5 , AR 1129).  Plaintiff admits that "probably all" of the Category C NAF activities that she supervised were losing money during her tenure at Maxwell AFB and were flagged by the Air Force as consistent money losers.  (Dale Depo, 61line 6, 62 lines 3-6 , 122 lines 13-16).

In June 2001, Lt Col Anne Marie Sykes was assigned as the Deputy Commander of the 42nd Mission Support Group at Maxwell AFB.  Lt Col Sykes was hired by the base commander based upon her extensive prior experience in Air Force Services and was tasked to help the 42nd Services Division (42 SVS), Plaintiff's organization, overcome

their severe financial and organizational problems.  Lt Col Sykes had no supervisory

relationship to Plaintiff and informed Plaintiff and all other employees assigned to 42

SVS that she had no authority to rate them or take any other actions and that she was on a

two year assignment to help the 42 SVS.  (AR 190)  Lt Col Sykes testified at the EEO

administrative hearing that when she arrived at Maxwell AFB the financial picture of the

activities supervised by Plaintiff was dismal. (AR 1134).

Lt Col Sykes was a career Services Officer and she had many years of experience

in that field.  Lt Col Sykes knew that the Category C NAF activities supervised by

Plaintiff had the potential to make or lose large amounts of money, somewhere in the

neighborhood of $5,000 to $25,000 per month.  In giving guidance and advice to 42 SVS,

Lt Col Sykes placed more emphasis on where the problems were, most notably the

Category C activities, which under Plaintiff's supervision were losing large sums of

money.  (AR 192).

Lt Col Sykes would admonish Plaintiff on occasions at staff meetings because

Plaintiff's organization, which was supposed to generate revenue, lost money on a regular

basis.  However, Lt Col Sykes always treated chiefs of organizations in similar situations

the same way.  AR 754 ("Colonel Sykes admonished everybody")[1]; AR 835-836 (" . . . it

wasn't just Ms. Dale that she was that way with.  She could be that way with myself, with

Ms. Gutierrez, with other leadership, but she would just raise her voice and get harsh in

---

[1]        EEO Hearing Testimony of Ms. JoAnn Langford who attended these meetings
with Lt Col Sykes and Plaintiff.

her tone. . . . I think whoever she was frustrated with at a given point in time. I would suspect Ms. Dale got the brunt of it more than others because of her flight having more problems and challenges than others")[2]; AR 1013 (Dale was not singled out "any more than any other flight chief with regards . . . to how well each activity was doing.")[3]. Plaintiff admitted at her deposition that Lt Col Sykes would single out "any facility that was losing money." (Dale Depo, 16 lines 15-18).

Beginning in April 2002, Plaintiff began periods of extended absences from work. From April 2002 until June 2002, Plaintiff worked approximately 50 percent of the time because of personal leave and sick leave due to an operation to have her gall bladder removed. (Dale Depo, 29 lines 22-25; 30 lines 1-2). From June 11, 2002, until January 13, 2003, Plaintiff was out of work completely due to a second operation, a gastric bypass, and other psychological issues (Dale Depo 30 lines 7-17).

Plaintiff's medical records indicate that in January 2001, Plaintiff weighed 286 pounds and was 64 inches tall. (Dale Depo Ex. 8). After several weight-related medical issues arose, including high blood pressure, gout, gall bladder problems and what Plaintiff believed was a heart attack in January 2001 (Dale Depo, 83 lines 1-16), Plaintiff sought a referral to a surgeon for a gastric bypass operation in April 2002. (Dale Depo, 85 lines 20-21). After Plaintiff obtained this referral, but before Plaintiff underwent the actual

---

[2]     EEO Hearing Testimony of Maj Marian Scavelli who attended these meetings with Lt Col Sykes and Plaintiff.

[3]     EEO Hearing Testimony of Mr. Paul Lewis who attended these meetings with Lt Col Sykes and Plaintiff.

gastric bypass surgery, Lt Col Sykes used the phrase "Fat, Dumb and Happy" at a staff meeting in early June 2002.  Lt Col Sykes used the phrase to caution all employees against complacency and did not direct the phrase at any one specific individual.  (AR 1152)  Maj Marian Scavelli, an attendee at that meeting, observed Lt Col Sykes use of the phrase and believes Lt Col Sykes intended the words "Fat, Dumb and Happy" to be understood as a colloquialism for "without concern."  (AR 207).

Although Plaintiff claims that she underwent the serious gastric bypass operation in an effort to improve her image with Lt Col Sykes (Dale Depo, 85 lines 10-19), she had sought a referral for a gastric bypass surgeon two months before Lt Col Sykes used the phrase "Fat, Dumb and Happy."  Moreover, Plaintiff's physician recommended she lose weight every time she went to see him (Dale Depo, 86 line 19-20), he also indicated she would not live another ten years if she did not lose weight.  (Dale Depo, 86 line 21-25).  Whatever Plaintiff's intent, the gastric bypass achieved its intended purpose.  On September 12, 2002, Plaintiff weighed 241 pounds (Dale Depo Ex. 16); On November 12, 2002, Plaintiff's weight was 222 pounds (Dale Depo Ex. 18); and on May 15, 2003, Plaintiff's weight was 181 pounds, a drop of 114 pounds.  (Dale Depo Ex. 19).

On September 4, 2002, while on extended sick leave, Plaintiff filed an EEO complaint against Lt Col Sykes.  This complaint alleged that Lt Col Sykes had discriminated against Plaintiff based on her disability (obesity) and alleged Lt Col Sykes had created a hostile work environment.  (Dale Depo Ex. 3)  On November 26, 2002,

Plaintiff filed a formal complaint of discrimination against Lt Col Sykes making the same allegations.  (Dale Depo Ex. 4).   On December 11, 2002, Plaintiff filed a revised formal EEO complaint which sought an additional remedy of "Administrative leave until retirement."  (Dale Depo Ex. 5).  Plaintiff has never claimed she was disabled.  Plaintiff testified at her deposition, while reviewing her position description (Dale Depo Ex. 20):

> Q:  Okay.  Were you able to effectively perform all the duties listed on this job description?
>
> A:  Yes.
>
> Q:  Whether your weight was 305 pounds or 181 pounds, you were able to do all those things, weren't you?
>
> A:  Yes.
>
> Q:  Did your weight ever impact your ability to do things outside of the office, like taking care of yourself on a daily basis?
>
> A:  No.
>
> Q:  Clean your house?
>
> A:  No.
>
> Q:  And that makes sense, because you're not claiming you're disabled.
>
> A:  No.  (Dale Depo, 96).

When Plaintiff returned from sick leave on January 13, 2003, her first level supervisor, Maj Marian Scavelli, had been replaced by Maj Matthew Wilson. (Dale Depo, 41 lines 21-23)  Plaintiff only worked for Maj Wilson for two months--January 13, 2003, through March 13, 2003, when Plaintiff again went on extended sick leave.  (Dale Depo,

49 lines 15-19).  During those two months, Maj Wilson did not discipline Plaintiff, he did

not make any annotations in her employee file, and he did not write her appraisal.  (Dale

Depo, 101 lines 20-22).  On March 18, 2003, Plaintiff amended her claim to include an

allegation of reprisal against Maj Wilson and alleged that Maj Wilson created a "hostile

work environment" in retaliation for her filing her EEO complaint against Lt Col Sykes.

(Dale Depo Ex. 7).  Maj Wilson testified that he was unaware Plaintiff had filed even

filed an EEO complaint against Lt Col Sykes until Plaintiff told him about the complaint

later in January 2003.  (AR 1081).

Plaintiff never returned from the extended sick leave she began on March 13,

2003.  Instead, she submitted a letter of resignation on May 30, 2003.  (Dale Depo 30-31,

AR 229).  During the two months Plaintiff worked for Maj Wilson, she admits that she

did not always take the anti-depressant medications recommended by her psychologist

and prescribed by her physician. (Dale Depo, 102 lines 15-18).  Plaintiff's psychologist

and physician prescribed three different anti-depressants, Wellbutrin, Zoloft and Effexor.

Plaintiff admits that in the December 2002-January 2003 timeframe, she made the

decision on her own to stop taking her medication and she "took a big plummet."  (Dale

Depo, 102 lines 24-25; 103 lines 1-3, 117 lines 19-25).  Plaintiff admits that it is "very

possible" that refusing to take her antidepressants made her more susceptible and more

emotional and more reactive.  (Dale Depo 103 lines 19-25).

At her deposition, Plaintiff clarified the timeline surrounding her resignation from

employment with the Air Force.  In late April 2003, while Plaintiff was on extended sick leave, Plaintiff and her husband began looking for properties in Texas to purchase and turn into a tea room/antique store/bed and breakfast.  (Dale Depo, 77 lines 7-8, 23-25).  A suitable property was located in Ingram, Texas in May 2003, and purchased by Plaintiff and her husband on June 6, 2003.  (Dale Depo, 78 lines 1-13).  Upon completion of necessary renovations to the property, Plaintiff and her husband opened "Queen B's English Tea Room."  (Dale Depo, 11 lines 18-20).  Plaintiff testified that her title at this business is "The Queen" and her duties include cooking, running a cash register, waiting on tables, cleaning bathrooms and doing laundry.  (Dale Depo, 11 line 25; 12 lines 1-10).  Plaintiff earns approximately $10,000 per year.  (Dale Depo, 10 lines 23-24).  Plaintiff also testified that she and her husband are their own bosses and that "it's perfect."  (Dale Depo, 12).  Plaintiff testified that she is currently physically and mentally able to perform the same job she did with the Air Force.  However, she has not applied for any other positions since resigning.  (Dale Depo, 125 lines 8-12; 126 lines 1-3).

### III.    THE COMPLAINT

In Count I Plaintiff alleges she was discriminated against by Lt Col Sykes on the basis of her perceived disability, weight.  Particularly she alleges Lt Col Sykes created a hostile work environment when she:

-    Told a group of co-workers she was sick and tired of GS employees sitting around fat, dumb and happy, while looking directly at Plaintiff;

-    Regularly scolded Plaintiff in business meetings;

-    Regularly bypassed Plaintiff by communicating directly with and tasking her subordinates with assignments, thereby undermining her authority;

-    Detailed Plaintiff to the golf course kitchen, instead of allowing her to decide how to solve the financial problems therein;

-    Placed Paul Lewis in the position of general club manager without discussing it with Plaintiff;[4]

-    Blocked Plaintiff's requested transfer to Randolph AFB;

-    Disapproved Plaintiff's request for a humanitarian transfer to the UK.[5], [6]

Plaintiff alleges in Count II that Lt Col Sykes retaliated and created a hostile work environment by blocking Plaintiff's requested transfer to Randolph AFB.  Plaintiff also alleges the following actions of Maj Wilson showed retaliation and created a hostile work environment:

-    Treated Plaintiff very coldly and harshly;

-    Admonished Plaintiff to not make any personnel changes for 90 days;

-    Communicated with Plaintiff through her subordinates;

-    Told Plaintiff she couldn't discipline Pam Hutto and that "a real leader

---

[4]    Plaintiff admitted at her deposition that she was the one who found Paul Lewis employed in the private sector, took him a job application and encouraged him to apply for the club manager position at Maxwell AFB.  (Dale Depo, 24 lines 6-20).

[5]    Plaintiff admitted at her deposition that she could only speculate that Lt Col Sykes is the one who disapproved this request.  (Dale Depo, 63 lines 15-20).

[6]    At her deposition on December 18, 2006, Plaintiff was given the opportunity to cite any additional actions on the part of Lt Col Sykes which would further show that Lt Col Sykes had created a hostile work environment.  Plaintiff had no further allegations to add.  (Dale Depo, 58 lines 1-6).

could handle the situation, and suck it up'"[7];

- Told supervisors at a staff meeting that he would exercise approval
  authority over everything Plaintiff did;

- Excluded Plaintiff from financial meetings;

- Said he couldn't wait to write Plaintiff's appraisal because he wanted to
  lower Plaintiff's ratings;

- Had a sign in his office that provided "Sarcasm, intimidation and fear are all
  acceptable leadership traits" and told another employee it was created for
  Plaintiff;

- When Plaintiff left a suicide prevention meeting obviously distraught, said,
  "I guess she'll be out another 10 months."[8], [9]

Although Plaintiff alleges the all of the above resulted in her constructive

discharge, she never filed an EEO complaint regarding alleging same.  Instead, Plaintiff

appealed her resignation to the Merit Systems Protection Board (MSPB) alleging she had

been forced to resign.  AR 230.  Plaintiff later withdrew this appeal to the MSPB citing

---

[7]    Plaintiff admitted at her deposition that she never wanted to discipline Pam Hutto
(Dale Depo 45 lines 12-13), and that Maj Wilson did not tell Plaintiff that "a real leader
could handle the situation, and suck it up."  Instead, another employee told Plaintiff she
heard Maj Wilson say this.  (Dale Depo, 46 lines 14-19).

[8]    Maj Wilson testified that he did make the comment, but it was not made to
Plaintiff and it was not made until after Plaintiff had phoned in to say she was back on
extended medical leave.  Plaintiff's return to sick leave on March 13, 2003, was shortly
before the unit was scheduled to undergo an intensive Operational Readiness Inspection--
a time when Plaintiff was very much needed in the office.  AR 1107.

[9]    At her deposition on December 18, 2006, Plaintiff was given the opportunity to
cite any additional actions on the part of Lt Col Sykes or Maj Wilson which would
further show a hostile work environment based on retaliation.  Plaintiff had no further
allegations to add.  (Dale Depo, 70 lines 16-23).

her wish to pursue the constructive discharge claim through the administrative EEO

process and on September 23, 2003, the MSPB granted Plaintiff's motion and dismissed

the appeal with prejudice.  AR 344.  However, Plaintiff and her counsel failed to properly

raise the issue of her constructive discharge with the EEOC.  On October 31, 2003,

Plaintiff requested an administrative hearing before the EEOC.  AR 350-51.  The hearing

was held April 12-13, 2004.  At the start of the hearing, Plaintiff's counsel, Mr. Guillot,

asked the EEOC Administrative Judge (AJ) to consider Plaintiff's constructive discharge

claim.  The AJ refused because Plaintiff's counsel had failed to properly file a motion to

raise that issue before the EEOC.  The Hearing Transcript on this issue from April 12,

2004, shows that Mr. Guillot had stated he would file a motion to have that issue included

in the EEO process, but that neither the AJ nor agency counsel ever received the motion.

The AJ ruled as follows:

> THE HEARING OFFICER:  I am not going to allow the complaint to be
> amended based on the timeliness factor as stated in the acknowledgment
> and order dated December the 4th, 2003.  At that point, the Complainant
> was advised that if she wanted to amend her complaint to add any
> additional claims that those would need to be made as soon as possible.
> And we have now gone through the discovery process, and the first time
> that was mentioned was during the prehearing. Therefore, based on
> timeliness, the request is denied.
>
> Hearing Transcript, AR 679-680.

Lt Col Sykes provided sworn testimony at the EEO hearing, set forth legitimate

non-discriminatory reasons for the actions she took involving Plaintiff, specifically

denied that she regarded Plaintiff as disabled, and denied that she had created a hostile

work environment as alleged by Plaintiff. (AR 1118). Maj Wilson also testified and denied discriminating or retaliating against Plaintiff as alleged. (AR 1065). At the conclusion of the hearing the EEOC AJ made detailed findings of facts and conclusions of law. As to the disability-based hostile work environment claim, identified as Count I in this lawsuit, the AJ determined that Plaintiff had not established that she was regarded as being disabled by the Air Force or Lt Col Sykes and that Plaintiff was therefore not a member of a protected group. (AR1248). The AJ further determined that the Plaintiff's allegations were insufficient to rise to a level of having the effect of unreasonably interfering with the work environment or being a hostile work environment and that a reasonable person in Plaintiff's circumstances would not have found the behavior or allegations to be hostile or abusive. As to the retaliation-based hostile work environment claim, Count II in this lawsuit, the AJ determined that the conduct Plaintiff alleged was neither severe nor pervasive and that a finding in favor of the Air Force was appropriate.

On July 12, 2004, Plaintiff appealed the EEOC decision to the EEOC Office of Federal Operations (OFO). On August 31, 2005, EEOC/OFO affirmed the decision of the Administrative Judge. (AR 1315-1321). Plaintiff filed her complaint in this lawsuit on December 12, 2005.

## IV.   ARGUMENTS AND CITATIONS OF AUTHORITY

### A.  Summary Judgment Standard.

Summary judgment should be granted where "the pleadings, deposition, answers

to interrogatories and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56 (c).  The Supreme Court has interpreted this standard to mandate summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which the party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 106 S. Ct. 2548, 2553, 91 L. Ed. 2d 265 (1986). *See also* Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). *and* Macon-Bibb County Hosp. Auth. v. Georgia Kaolin Co., 646 F. Supp. 90, 92-95 (M.D. Ga. 1986) (relying on Celotex while granting summary judgment against plaintiff), aff'd, 817 F.2d 98 (11th Cir.1987).

**B.    The Plaintiff cannot establish a prima facie case of discrimination in violation of the Rehabilitation Act.[10]**

To survive summary judgment, an employee must provide evidence that supports an inference that the employer regarded the employee as: 1) as having an impairment covered by the Rehabilitation Act; and 2) that the impairment substantially limited a major life activity.  Therefore, in the instant case, Plaintiff must demonstrate that Lt Col Sykes perceived Plaintiff  "as having an impairment [covered by the Rehabilitation Act]

---

[10]    To the degree the complaint may be construed to set forth claims of disparate treatment, same are due to be dismissed as Plaintiff for the reasons set forth cannot demonstrate that she was a qualified individual within the meaning of the Rehabilitation Act.

that substantially limit[ed] a major life activity." *See*, Collado v. United Parcel Service, Inc., 419 F.3d 1143, 1157, *citing*, Hilburn, 181 F.3d at 1230; Standard v. A.B.E.L. Services, Inc., 161 F.3d 1318, 1327 (11th Cir. 1998).[11]

### 1.    Plaintiff cannot demonstrate that she was regarded as having an impairment covered by the Rehabilitation Act.

The Supreme Court has explained that a "person is 'regarded as' disabled within the meaning of the ADA if a covered entity mistakenly believes that the person's actual, nonlimiting impairment substantially limits one or more major life activities." Murphy v. UPS, 527 U.S. 516, 521-22 (1999); *see also* Hilburn v. Murata Elecs. N. Am., 181 F.3d 1220, 1230 (11th Cir. 1999) ("As with actual disabilities, a perceived impairment must be believed to substantially limit a major life activity of the individual.").  Furthermore, a plaintiff must allege and demonstrate that she was perceived to have an impairment protected by the relevant Act, be it the ADA or the Rehabilitation Act, as opposed to a disability not covered by the statute that is perceived by the employer to be limiting. EEOC v. Watkins Motor Lines, Inc., 463 F.3d 436, 440 (6th Cir. 2006), *citing*, Andrews v. State of Ohio, 104 F.3d 803, 807 (6th Cir.1997) (discussing the ADA and the Rehabilitation Act and holding that "to set forth a *prima facie* case··· plaintiff must allege either that they are or are perceived to be handicapped *within the definitions of each of the acts* ")(emphasis added); Francis v. City of Meriden, 129 F.3d 281, 285 (2nd Cir.1997) (to

---

[11]    Discrimination claims under the Rehabilitation Act are governed by the same standards as Americans with Disabilities Act claims.  Cash v.Smith, 231 F. 3d 1301, 1305 (11th Cir. 2000).  Thus, "[c]ases decided under the Rehabilitation Act are precedent for cases under the ADA, and *vice-versa*."  Cash, 231 F. 3d at 1305 n.2 (11th Cir. 2000).

Page 14 of  33

bring and ADA or RHA claim, a plaintiff must allege that his employer "regarded him as having an 'impairment' *within the meaning of the statutes* ")(emphasis added): *See, also,* Carruthers v. BSA Advertising, 357 F.3d 1213, 1216 (11th Cir. 2004) ("Under the "regarded as" prong, a person is "disabled" if her employer perceives her as having an ADA-qualifying disability, . . . "), *and* Murray v. John D. Archibold Memorial Hospital, Inc., 50 F.Supp.2d 1368, 1377 (M.D. Ga. 1999) (plaintiff must demonstrate they were "regarded as having the kind of impairment contemplated by the statute in order to recover.").

The EEOC has issued regulations implementing the ADA in which it defined a "physical impairment" as "[a]ny physiological disorder, or condition, cosmetic disfigurement, or anatomical loss affecting one or more of the following body systems: neurological, musculoskeletal, special sense organs, respiratory (including speech organs), cardiovascular, reproductive, digestive, genito-urinary, hemic and lyphatic, skin, and endocrine. 29 C.F.R. § 1630.2(h)(1). Furthermore, the EEOC guidelines state the "definition of impairment does not include physical characteristics such as eye color, hair color, left-handedness, or height, weight or muscle tone that are within 'normal' range and are not the result of a physiological disorder." 29 C.F.R. pt 1630, App. § 1630.2(h). Finally, the guidelines say that "except in rare circumstances, obesity is not considered a disabling impairment." 29 C.F.R. pt 1630, App.§ 1630.2(j).

The Eleventh Circuit has never considered the issue of whether obesity is an

impairment for purposes of establishing disability under the Rehabilitation Act.[12]  Other circuits, however, have found, or implied, that in order for obesity to be an impairment it must not only affect a bodily system but must also result from a physiological condition. *See,* EEOC v. Watkins Motor Lines, Inc., 463 F.3d 436, 440 (6th Cir. 2006) ("morbid obesity may be an ADA impairment "where it has a physiological cause," non-physiological morbid obesity is not an "impairment" under the ADA); Andrews v. State of Ohio, 104 F.3d 803, 808 (6th Cir.1997) ("physical characteristics that are 'not the result of a physiological disorder' are not considered 'impairments' for the purposes of determining either actual or perceived disability"); Francis v. Meriden, 129 F.3d 281, 286 (2d Cir.1997) (finding "obesity, except in special cases where the obesity relates to a physiological disorder, is not a 'physical impairment' within the meaning of the [ADA]"); Cook v. State of Rhode Island, Dep't of Mental Health, Retardation and Hospitals, 10 F.3d 17, 23 (1st Cir.1993) (upholding jury verdict for a plaintiff who claimed she was discriminated against in violation of the Rehabilitation Act due to her morbid obesity because jury could plausibly have found that plaintiff's morbid obesity was a physical impairment as "she presented  expert testimony that morbid obesity is a physiological disorder involving a dysfunction of both the metabolic system and the neurological

---

[12]    While the Eleventh Circuit does not appear to have addressed the question, at least one district court in this circuit has.  In Coleman v. Georgia Power Co.,, the Court stated, " it appears to this court that while obesity generally is not considered an impairment it can be found to be an impairment in limited circumstances where it is shown both to affect one of the bodily systems outlined in the guideline definition for physical impairment and where such obesity is related to a physiological disorder." Coleman v. Georgia Power Co., 81 F.Supp.2d 1365, 1369 (N.D. Ga. 2000).

appetite-suppressing signal system, capable of causing adverse effects within the musculoskeletal, respiratory and cardiovascular systems.").

Plaintiff cannot demonstrate that her alleged obesity is an impairment covered by the Rehabilitation Act. Quite simply, the record is void of any evidence suggesting that the plaintiff's obesity was the product of a physiological disorder and in the absence of such she cannot establish that her obesity was an impairment contemplated by the statute. Accordingly, Plaintiff cannot establish that Lt. Col. Sykes perceived her to suffer from an impairment that was covered by the Rehabilitation Act.

> **2.    Plaintiff cannot demonstrate that she was perceived to be substantially limited in her ability to perform a major life activity.**

The Rehabilitation Act defines an "individual with a disability" as a person who: (1) has a physical or mental impairment that substantially limits one or more of such person's life activities; (2) has a record of such an impairment; or (3) is regarded as having such an impairment. 29 U.S.C. 705(20)(B). Plaintiff is proceeding in this matter under the third prong.

Since plaintiff alleges that the defendant regarded her as disabled, she must prove more than that the defendant perceived her to be impaired by a medical condition. Specifically, Plaintiff must introduce evidence that the defendant regarded her to be so impaired or disabled that she was substantially limited in her ability to perform a major life activity. Toyota Motor Mfg., Ky., Inc. v. Williams, 534 U.S. 184, 194-95, 122 S.Ct.

681, 690, 151 L.Ed.2d 615 (2002).  The Supreme Court has developed a narrow

interpretation of the phrase "substantially limited life activity." According to the Court,

the impairment must "prevent[s] or severely restrict[s] the individual from doing

activities that are of central importance to most people's daily lives." <u>Toyota v. Williams</u>,

534 U.S. 184, 198, 122 S.Ct. 681, 151 L.Ed.2d 615 (2002).

     Plaintiff has not alleged a major life activity that she believes Lt. Col. Sykes

regarded her as being substantially limited in performing.  Instead she has alleged that

"Lt. Col. Sykes, Ms. Dale's third-level supervisor, regarded Ms. Dale as being limited in

her ability to perform her position."  Complaint, ¶ 7.  Assuming, arguendo, that she is

attempting to allege that she was perceived by the defendant to be substantially limited in

the major life activity of working, Plaintiff cannot establish that the defendants regarded

her as being substantially limited within the meaning of the Rehabilitation Act.

     "To be substantially limited in the major life activity of working, an individual

must be precluded from more than one type of job, even if the job foreclosed is the

individual's job of choice." <u>Cash v. Smith</u>, 231 F.3d 1301, 1306 (11th Cir.2000).

Furthermore, a person's inability to perform a single, particular job does not constitute a

substantial limitation in the major life activity of working.  29 C.F.R. § 1630.2(j)(3)(I);

see also <u>Hilburn v. Murata Elec. N. Am., Inc.</u>, 181 F.3d 1220, 1227 (11th Cir.1999).

Rather, "[w]hen the major life activity under consideration is that of working, the

statutory phrase 'substantially limits' requires, at a minimum, that plaintiffs allege they

are unable to work in a broad class of jobs." <u>Sutton v. United Air Lines, Inc.</u>, 527 U.S. 471, 491, 119 S.Ct. 2139, 2151, 144 L.Ed.2d 450 (1999).  Therefore, Plaintiff is "disabled" under the Rehabilitation Act if Lt. Col. Sykes regarded her as substantially limited in her ability to work in a broad class of jobs. <u>Standard v. A.B.E.L. Services, Inc.</u>, 161 F.3d 1318, 1327 n. 2 (11th Cir.1998).

 The record is void of any evidence, and Plaintiff will not be able to produce any evidence that Lt. Col. Sykes perceived her as being substantially limited in her ability to work in a broad class of jobs.  Giving to Plaintiff the benefit of the doubt, the best Plaintiff can muster is that Lt. Col. Sykes perceived her as substantially limited in her ability to perform the particular job that Plaintiff was performing at the time of the alleged discriminatory act(s).  "Being'regarded as unable to perform only a particular job,' however, 'is insufficient, as a matter of law, to prove that [the plaintiff] is regarded as substantially limited in the major life activity of working.'" <u>Collado v. United Parcel Service, Co.</u>, 419 F.3d 1143, 1157 (11th Cir. 2005), *quoting*, <u>Murphy v. United Parcel Serv.</u>, 527 U.S. 516, 525, 119 S.Ct. 2133, 2139, 144 L.Ed.2d 484 (1999).  "'Thus, an impairment must ... be perceived to preclude [ ] an individual from more than one type of job, even if the job foreclosed is the individual's job of choice.'" <u>Id</u>., *quoting*, <u>Rossbach v. City of Miami</u>, 371 F.3d 1354, 1359 (11th Cir.2004).

 As Plaintiff has not alleged nor can she demonstrate that she was perceived to be substantially limited in the performance of a major life activity, she has failed to establish

that she is an "individual with a disability" as defined in the Rehabilitation Act. Plaintiff's claims of discrimination based on the Rehabilitation Act are therefore due to be dismissed and the defendant is entitled to a grant of summary judgment.

### C.   The Plaintiff cannot establish a prima facie case of hostile environment discrimination under the Rehabilitation Act.

Hostile environment harassment occurs "[w]hen the workplace is permeated with 'discriminatory intimidation, ridicule and insult' that is 'sufficiently severe or pervasive to alter the conditions of the victims employment.' " Harris v. Forklift Systems, Inc., 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993)(*quoting* Meritor Savings Bank, FSB v. Vinson, 477 U.S. 57, 65, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986)). Hostile environment claims based upon a disability are analyzed under the Title VII standards applicable to sexual harassment claims. *See* Rio v. Runyon, 972 F.Supp. 1446, 1459 (S.D.Fla.1997).

In order to establish a successful hostile work environment claim, the plaintiff must show "1) that he belongs to a protected group; 2) that he has been subject to unwelcome harassment; 3) that the harassment must have been based on a protected characteristic of the employee, . . . ; 4) that the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment; and 5) that the employer is responsible for such environment . . ." Miller v. Kenworth of Dothan, Inc, 277 F.3d 1269, 1275 (11th Cir. 2002).

### 1.   Plaintiff cannot demonstrate that she was subjected to

**unwelcome harassment on the basis of her alleged disability because she did not belong to a protected group.**

Plaintiff's claims of harassment amounting to a hostile environment on the basis of her perceived disability are subject to dismissal as she cannot establish that she was a qualified individual under the Rehabilitation Act for the reasons discussed above. Because she failed to establish that she is a qualified individual with a disability under the Rehabilitation Act, she has not established that she is a member of a protected group. Thus, she cannot meet the first and third prongs of a prima facie case of disability-based hostile environment. For this reason alone, the defendant is entitled to summary judgment on this claim.

2.     **Plaintiff cannot demonstrate that she was subjected to a hostile environment based on her perceived disability as she cannot demonstrate that the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment belong to a protected group.**

In order to prove harassment, Plaintiff must show that her work place was "permeated with 'discriminatory intimidation, ridicule, and insult' that is 'sufficiently severe or pervasive to alter the conditions her employment and created an abusive working environment." Harris v. Forklift Sys. Inc., 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993). "Establishing that harassing conduct was sufficiently severe or pervasive to alter an employee's terms or conditions of employment includes a subjective and an objective component." Harris, 510 U.S. at 21-22.

"[T]he objective severity of harassment should be judged from the perspective of a reasonable person in the plaintiff's position, considering 'all the circumstances.'" Oncale v. Sundowner Offshore Services, Inc., 523 U.S. 75, 118 S.Ct. 998, 1003, 140 L.Ed.2d 201 (1998)(quoting Harris, 510 U.S. at 23).  Analysis of the objective component is fact intensive.  Mendoza v. Borden, 195 F.3d 1238, 1246 (11th Cir. 1999).

The factors that should be considered by the court in determining whether harassment objectively altered Plaintiff's terms or conditions of employment are: "(1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or humiliating or a mere offensive utterance; and (4) whether the conduct unreasonably interferes with the employee's job performance."  Mendoza, 195 F.3d at 1246.  "The courts should examine the conduct in context, not as isolated acts, and determine under the totality of circumstances whether the harassing conduct is sufficiently severe or pervasive to alter the terms or conditions of the plaintiff's employment and create a hostile or abusive working environment."  Id.  "The demanding standards for judging abusive working environments were designed to prevent civil rights statutes from becoming 'general civility code[s],'", and "[a]pplied judiciously, these standards will 'filter out complaints attacking 'ordinary tribulations of the workplace.' " Schwertfager v. City of Boynton Beach, 42 F.Supp.2d 1347, 1366-1367, (S.D.Fla.,1999), *quoting*, *respectively,* Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 118 S.Ct. 998, 1002, 140 L.Ed.2d 201 (1998) and Faragher v. City of Boca Raton, 524 U.S. 775, 118 S.Ct. 2275, 2284, 141 L.Ed.2d 662 (1998) (quoting source omitted).

"Although the court examines the statements and conduct complained of collectively in determining whether they were sufficiently pervasive or severe to constitute disability harassment, the statements or conduct must be related to plaintiff's disability or perceived disability." Stedman v.Bizmart, Inc., 219 F.Supp.2d 1212, 1223 (N.D.Ala.2002), *citing*, Gupta, 212 F.3d at 583. Significantly, "[i]solated and innocuous incidents, even if intentional, will not support a hostile environment claim and are not counted." Id.

Plaintiff alleges that Lt Col Sykes looked directly at Plaintiff and said that she was sick and tired of GS employees sitting around "Fat, Dumb and Happy;" scolded Plaintiff in a business meeting; sought input from Plaintiff's subordinates and tasked them with assignments; detailed Plaintiff to the golf course kitchen in order to ascertain why the kitchen was losing money; placed Mr. Lewis in a position without discussing it with Plaintiff; blocked an employee from Randolph AFB from transferring to Maxwell AFB and disapproved Plaintiff's request for a humanitarian transfer.

For each of these actions Lt. Col. Sykes has presented a legitimate non-discriminatory reason for the actions that she took. As previously noted, the comment attributed to Lt. Col. Sykes was made, but was a statement regarding complaceny amongst the staff as opposed to a comment on Plaintiff's weight. Lt. Col. Sykes explained that she did, on occasion, make negative comments about Plaintiff's business operations due to the fact that all entities under Plaintiff's supervision were not performing financially. A.R.

1150-1151. Lt. Col. Sykes also explained that she sought input from Plaintiff's subordinates, but that these actions were predicated on the demands of the job, not in an effort to discriminate against Plaintiff. A.R. 1157-1159. Given that the golf course kitchen was continually losing money, Lt. Col. Sykes recommended that Plaintiff spend time at the location to determine the reasons for the losses, not to discriminate against Plaintiff on the basis of her weight. A.R. 1161-1163. While Lt. Col. Sykes testified that the decision to place Mr. Lewis in a position was hers, it was suggested to her by Plaintiff as well as others. A.R. 1153-1157. Contrary to Plaintiff's assertions, Lt. Col. Sykes did not approve the swap/transfer of Plaintiff to Randolph AFB in an effort to discriminate against her, rather the decision to not approve the swap/transfer was based on negative reports regarding the performance of the person who would be replacing Plaintiff. A.R. 1168. Finally, Lt. Col. Sykes did not disapprove Plaintiff's request for humanitarian transfer, rather she wrote a letter recommending approval on Plaintiff's behalf. A.R. 1167.

Even if the allegations Plaintiff makes are taken as completely true, they fail to rise to a level of having the effect of becoming a hostile work environment. First, Plaintiff can not demonstrate that any of the alleged actions were related to her perceived disability. Second, Plaintiff cannot establish that any of the actions complained of effected the terms and conditions of her employment in that she cannot show she was demoted, received poor performance reviews or were subjected to any materially adverse actions on the basis of

her perceived disability.  A reasonable person in the Plaintiff's circumstances[13] would not have found the behavior to be hostile or abusive.

The acts Plaintiff complains about do not constitute harassment under the objective standard.  No single incident, combination of incidents, or the aggregate of the alleged acts complained of described herein is sufficient to constitute a hostile environment on the basis of Plaintiff's alleged disability.  While Plaintiff may not have liked the aforementioned actions, they do not rise to the level of harassment.

> **D.**    **Plaintiff's cannot demonstrate a prima facie case of hostile work environment through retaliation.**

In order to establish a prima facie case of hostile work environment based upon retaliation, Plaintiff must establish:  1) she engaged in statutorily protected expression, 2) that there was subsequently an adverse action, and 3) that there is a causal link between the protected expression and the adverse action.  Perryman v. West, 949 F.Supp.815 (M.D. Ala. 1996), *citing,* Meeks v. Computer Assoc. Intern'l., 15 F.3d 1013, 1021 (11th Cir.1994).

> **1.    Plaintiff cannot demonstrate an adverse action.**

Plaintiff's alleged adverse action is an alleged hostile work environment. In the context of retaliation claims, "a plaintiff must show that a reasonable employee would have

---

[13]    Had she not resigned, Plaintiff would have had 30 years of service with the Air Force in October 2005 and would have been eligible for retirement.  (Dale Depo, 129) This circumstance should be considered in determining what a reasonable person would have considered hostile or abusive with approximately 18 months remaining until retirement.

found the challenged action materially adverse, "which in this context means it well might have 'dissuaded a reasonable worker from making or supporting a charge of discrimination.' " Burlington Northern and Santa Fe Ry. Co. v. White, 126 S.Ct. 2405, 2415 (2006).  The requirement that the adverse action be materially adverse means that employees are not protected from "those petty slights or minor annoyances that often take place at work."  Id.

In LeBlanc v. TJX Co., Inc., 214 F. Supp.2d 1319 (S.D. Fla. 2002), the plaintiff claimed five instances to support a hostile work environment claim.  He alleged that 1) he was falsely accused of not meeting his job requirements; 2) that his supervisor disorganized his work space to disorganize the plaintiff so he would be accused of not completing tasks; 3) he was called slow; 4) he was told he didn't do anything correctly; and 5) Plaintiff was subjected to numerous write-ups and that the stress from these actions caused him to collapse one night.  Id. at 1332.  The court held that these allegations were not severe or frequent enough to support a hostile work environment claim nor sufficiently hostile that a reasonable person would find it abusive.  Id. at 1332.  "[S]imple teasing . . . offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment."  Faragher v. City of Boca Raton, 524 U.S. 775, 778 (1998).  It is not harassment for supervisors to monitor the performance of their employees.  McCoy v. Macon Water Authority, 966 F. Supp. 1209, 1221 (M.D. Ga 1997).

Plaintiff alleges that Maj Wilson did not communicate with her except through e-mail and other employees; prevented Plaintiff from disciplining an employee on one or two occasions; told a third party that he could not wait to give Plaintiff her appraisal; took notes while observing Plaintiff on a single occasion; and posted notices in his office that weren't appropriate.  It is worth noting that Plaintiff only worked for Maj Wilson from the time she returned to duty for sick leave on January 13, 2003, until she again went on sick leave on March 13, 2003--a period of two months.  Plaintiff's admissions about her decision to stop taking prescribed anti-depressant medications during the time she worked for Maj Wilson very possibly making her more susceptible, more emotional and more reactive (Dale Depo 103) must also be considered.  In sum, Plaintiff's allegations do not rise to the level of

**2.     Plaintiff cannot demonstrate a causal link between the protected expression and the adverse action.**

Additionally, Plaintiff cannot show the alleged harassment was caused by any protected activity. To demonstrate the requisite causal connection, a plaintiff must show that her protected activity and any subsequent actions were not completely unrelated.  See Wideman v. Wal-Mart Stores, Inc., 141 F.3d 1453, 1457 (11th Cir. 1998).   This requires showing, at a minimum, that the decision-maker had knowledge of the complaints.  See Strickland v. Water Works and Sewer Bd., 239 F.3d 1199, 1207-1208 (11th Cir. 2001).  In this case, Wilson did not have knowledge that Plaintiff had filed any EEO complaint until late January 2003.  (AR 1081). This was after he had allegedly been "cold and harsh" to

Plaintiff at their first meeting and told Plaintiff not to make any personnel changes for 90 days. (AR 1081). Since Wilson did not know about Plaintiff's EEO complaint when he allegedly was "cold and harsh" and told her not to make any personnel changes, Plaintiff cannot show that his actions were caused by her complaint. See Brungart v. BellSouth Teles., Inc., 231 F.3d 791, 799 (11th Cir. 2000) (common sense dictates that "a decision-maker cannot have been motivated ... by something unknown to him.")

In addition, Wilson has legitimate, non-discriminatory explanations for his actions that have nothing to do with any EEO activity by Plaintiff. Wilson told Plaintiff not to make any personnel changes for 90 days because he had recently taken some Business Based Actions ("BBAs"), which were actions that he could take to turn things around when a business was not making money. (AR 1078-1079). For his recent changes to come to fruition and save money, he had to ensure there were not any more personnel changes. (AR 1101). Wilson advised Plaintiff that she could not discipline Ms. Hutto for missing a meeting, because Ms. Hutto had been given wrong information about the time of the meeting. (AR 1085-1086). He told Plaintiff it was Plaintiff's call as to whether she wanted to discipline Ms. Hutto for being rude to Plaintiff on the telephone. (AR 1086-1087). Wilson had paper sign in his office that stated "Fear, sarcasm and intimidation are acceptable leadership traits when used in moderation." (AR 1089). The statement was a comment made by Lt. Weaver during a weekly P&L session that everyone thought was funny. (AR 1089). Wilson thought it was particularly funny, so he wrote the sign and put it up in his office. (AR 1089). He did not create the sign for Plaintiff. (AR 1090-1091).

Finally, the fact that Wilson treated Plaintiff the same before and after he allegedly found out about her EEO complaint further removes any inference of causation.  See Spence v. Panasonic Copier, Co., 46 F. Supp. 2d. 1340, 1349 (N.D. Ga. 1999).

Even if the Plaintiff's allegations are taken as completely true, they fail to rise to a level of having the effect of becoming a hostile work environment.  There is no evidence that Plaintiff can point to that indicates Maj Wilson's actions were predicated upon a desire to retaliate against her for filing a discrimination complaint as opposed to some other reason.  A reasonable person in these circumstances would not have found the behavior to be hostile or abusive.

### E.    Plaintiff's claim of constructive discharge is due to be dismissed for her failure to administratively exhaust same.[14]

A federal employee must exhaust her administrative remedies as a jurisdictional prerequisite to filing a Title VII claim.  *See* Brown v. General Servs. Admin., 425 U.S. 820, 832-33 (1976); West v. Gibson, 527 U.S. 212, 218-19 (1999) (The purpose of exhaustion is to create a "dispute resolution system that requires a complaining party to pursue administrative relief prior to court action..."); Crawford v. Babbitt, 186 F.3d 1322, 1326 (11th Cir. 1999).  Such requirements also apply to claims arising under the Rehabilitation Act.  See Doe v. Garrett, 903 F.2d 1455, 1461 (11th Cir. 1990), cert. denied, 499 U.S. 904 (1991)("… private actions against federal government employers under the Act, whether brought under section 791 or 794, must satisfy 'the requirement of

---

[14]    Similarly, to the degree that the complaint may be construed to set forth claims of disparate treatment, same have not been properly exhausted as they were not presented in the course of the administrative proceedings.  A.R. 653.

exhaustion of administrative remedies….'"). <u>Crawford v. Babbitt</u>, 186 F.3d 1322 (11th Cir. 1999), held "[t]he purpose of exhaustion is to give the agency the information it needs to investigate and resolve the dispute between the employee and the employer[.]" <u>Id.</u> at 1326. "The purpose of exhaustion is to give the agency the information it needs to investigate and resolve the dispute between the employee and the employer. Good faith effort by the employee to cooperate with the agency and EEOC and to provide all relevant, available information is all that exhaustion requires." <u>Wade v. Secretary of the Army</u>, 796 F.2d 1369, 1377 (11th Cir.1986).

Plaintiff never filed an administrative EEO complaint regarding her resignation. She appealed her resignation to the MSPB, but later withdrew that appeal and neglected to timely raise the issue as the remainder of her issues went before an EEOC AJ. It is very clear Plaintiff and her counsel were familiar with the administrative EEO process in that she filed an initial complaint on September 4, 2002, a formal complaint on November 26, 2002, a revised formal complaint on December 11, 2002, and a claim of retaliation on March 18, 2003. Yet, Plaintiff failed, at any time, to raise the issue of her resignation with the EEOC. The EEOC AJ specifically ruled that she would not hear evidence on or make a decision regarding Plaintiff's claim of constructive discharge. Therefore, the issue has not been administratively exhausted and must be dismissed. Likewise, Plaintiff's claim for back pay should also be stricken since that issue is linked to the alleged constructive discharge.

**F.     Even if Constructive Discharge is Properly Before the Court, Plaintiff's Claims Must Fail.**

To establish constructive discharge, a plaintiff must show that working conditions were "so intolerable that a reasonable person in [his] position would have been compelled to resign." *See* Hipp v. Liberty Nat'l Life Ins., Co., 252 F.3d 1208, 1231 (11th Cir. 2001). *See also* Pennsylvania State Police v. Suders, 542 U.S. 129 (2004).  This objective standard is "quite high," and requires a showing that the work conditions went beyond a mere hostile working environment.  *See* Walton v. Johnson & Johnson Servs., 347 F.3d 1272, 1282 (11th Cir. 2003); Hipp, 252 F.3d at 1231.  Furthermore, a plaintiff must provide her employer a chance to remedy the allegedly intolerable working conditions before quitting her job. *See* Kilgore v. Thompson & Brock Mgmt., Inc., 93 F.3d 752, 754 (11th Cir. 1996); Howard v. Burns Bros, Inc., 149 F.3d 835, 842 (8th Cir. 1998).  Moreover, "part of an employee's obligation to be *reasonable* is an obligation not to assume the worst, and not to jump to conclusions too fast."  Garner v. Wal-Mart Stores, Inc., 807 F.2d 1536, 1539 (11th Cir. 1987) (affirming summary judgment where the employee quit after one day in what she perceived as an unacceptable position).

In this case, even accepting Plaintiff's complaints about Sykes as true, no reasonable would have felt compelled to resign.  See Fitz v. Pugmire Lincoln-Mercury, Inc., 348 F.3d 974 (11th Cir. 2003).  Indeed, the facts in this case fall well short of those instances where the Eleventh Circuit has found an intolerable working environment.  See, e.g., Poole v. County Club of Columbus, Inc., 129 F.3d 551, 553 (11th Cir. 1997) (holding plaintiff had

shown possible constructive discharge where relocated plaintiff to a new work station with only a chair but no desk or computer, told other employees not to talk to her, and stripped of all her job duties).

In addition, Plaintiff quit before giving her employer a chance to correct any problems.  Plaintiff admits that she only worked for Maj Wilson for a period of two months--January 13, 2003, through March 13, 2003.  Further, Plaintiff's EEO claim of reprisal against Maj Wilson was not filed until March 18, 2003--after Plaintiff had left the workplace never to return.  *See* Kilgore, 93 F.3d at 754 ("a constructive discharge will generally not be found if the employer is not given sufficient time to remedy the situation).

## CONCLUSION

Plaintiff failed to administratively exhaust her claim of constructive discharge. Further, she is not disabled and was not regarded as disabled and the allegations she makes, even if true, are not severe and pervasive enough to constitute a hostile work environment or constructive discharge.  Defendant requests that this Court order that Summary Judgment be entered for the Defendant.

Respectfully submitted this the 9th day of February 2007.

LEURA G. CANARY
United States Attorney

By: s/R. Randolph Neeley
R. RANDOLPH NEELEY
Assistant United States Attorney
Bar Number: 9083-E56R
Post Office Box 197
Montgomery, AL  36101-0197
Telephone No.: (334) 223-7280
Facsimile No.: (334) 223-7418
**E-mail: rand.neeley@usdoj.gov**

Of Counsel:

ARTHUR G. KIRKPATRICK
Major, United States Air Force, Trial Attorney
General Litigation Division
1501 Wilson Blvd, 7th Floor
Arlington, VA 22209-2403

## CERTIFICATE OF SERVICE

I hereby certify that on February 9, 2007, I electronically filed the foregoing with

the Clerk of the Court using the CM/ECF system which will send notification of such

filing to Plaintiff's attorney, Joseph C. Guillot, Esquire.

    s/R. Randolph Neeley
Assistant United States Attorney