IN THE DISTRICT COURT OF THE UNITED STATES FOR THE

MIDDLE DISTRICT OF ALABAMA, NORTHERN DIVISION

| | | |
|---|---|---|
| BRIDGET DALE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | CIVIL ACTION NO. |
| v. | ) | 2:05cv1179-MHT |
| | ) | (WO) |
| MICHAEL W. WYNNE, | ) | |
| Secretary, Department of | ) | |
| the Air Force, | ) | |
| | ) | |
| Defendant. | ) | |

OPINION

Relying on the Rehabilitation Act of 1973, 29 U.S.C.
§§ 701-796l, plaintiff Bridget Dale has brought this
lawsuit claiming that her former employer, the United
States Air Force, sued through defendant Michael Wynne,
Secretary of the Air Force, impermissibly discriminated
against her because of her weight and impermissibly
retaliated against her for filing a disability-
discrimination complaint. Dale seeks to recover based on

four theories: disparate-treatment disability discrimination, hostile-work environment, retaliation, and constructive discharge. Jurisdiction is proper pursuant to 29 U.S.C. § 794a. For reasons given below, the court will grant the Air Force Secretary's motion for summary judgment.

## I.  SUMMARY-JUDGMENT STANDARD

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment is appropriate where "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Once the party seeking summary judgment has informed the court of the basis for its motion, the burden shifts to the non-moving party to demonstrate why summary judgment would be inappropriate. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986); see also Fitzpatrick v. City of Atlanta, 2 F.3d 1112, 1115-17 (11th Cir. 1993) (discussing how the responsibilities on the movant and the nonmovant vary depending on whether

the legal issues, as to which the facts in question pertain, are ones on which the movant or nonmovant bears the burden of proof at trial). In making its determination, the court must view all evidence and any factual inferences in the light most favorable to the nonmoving party. <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986). Thus, at the summary-judgment stage, the court assumes that the facts are as Dale alleges and makes all reasonable inferences in favor of her as the nonmoving party.


## II.  FACTS

Dale was employed by the United States Air Force for 29 years. Her last position, which she held from June 2000 until she resigned on June 13, 2003, was as Chief of Business Operations Flight at Maxwell Air Force Base, Montgomery, Alabama. Dale received high appraisals for the eight years before her resignation. During much of this time, Dale was 5'3" tall and she weighed over 300 pounds.

3

In June 2001, Lt. Col. Ann Marie Sykes was assigned to Dale's division to correct its financial problems. Sykes began to berate her in staff meetings and treat her poorly. Dale believed that, although her weight did not limit her ability to perform her job, Sykes perceived her as having a disability because she was overweight. However, Dale's long history of outstanding appraisals, as well as the sworn testimony of many of her colleagues and subordinates, attested to her ability to train her employees and perform her job well.

The following incidents highlight what Dale believed to be disability discrimination due to her weight:

- During a staff meeting and while looking directly at Dale, Sykes said she was "tired of certain civil service employees sitting around fat, dumb and happy."[1]

_____

1.    Sykes denies that the statement was directed at Dale and contends that the statement was a reminder to all the employees not to be too complacent in their jobs.

- Sykes suggested Dale work in the golf-course snack bar kitchen.[2]

- Sykes prevented Dale from transferring to a position at Randolph Air Force Base, Texas, as a swap for an employee at that location.[3] Sykes said she did not want to replace one incompetent business flight chief with another.

- Dale requested and was denied a humanitarian transfer to England.[4]

- Sykes undermined Dale's authority by going outside the chain of command and directly contacting Dale's subordinates when Sykes needed information.

---

2. Sykes maintains that she suggested Dale make the move solely because the kitchen was losing money.

3. Sykes says that she denied the requested transfer because the person at Randolph Air Force Base was unacceptable.

4. Dales assumes that, because she did not get the transfer, Sykes must have blocked it. It is unclear whether Sykes knew about the requested transfer; however, she denies taking any steps to block it.

- Sykes removed a major portion of Dale's responsibilities when she appointed Paul Lewis, one of Dale's subordinates, as the Director of Club Operations.

- Sykes said Dale could not train her people.

In June 2002, in an effort to gain Sykes's approval and acceptance, Dale underwent gastric bypass surgery so that she could quickly lose weight. She believed that her image with Sykes would improve if she were a smaller person. Following the surgery, Dale took a six-month leave of absence.

On July 26, 2002, Dale filed an informal complaint of disability discrimination against Sykes. On November 26, 2002, Dale contacted an equal-employment opportunity ("EEO") officer and filed a formal complaint alleging disability discrimination and hostile-work environment.

On January 13, 2003, Dale returned to work to discover that Maj. Matthew Wilson was her new supervisor. At their first meeting, Wilson barely acknowledged

Dale's presence and dismissed her from the meeting until later in the day. During their second meeting, the same day, Wilson was very short with Dale and instructed her not to make any personnel changes for 90 days. Since they had never worked together, Dale thought Wilson's treatment of her was very unusual .

Similarly to the way Sykes treated Dale, Wilson also dealt directly with Dale's subordinates, and, as a result, Dale's authority was again undermined by having her supervisor bypass her and go directly to her subordinates. On one particular occasion, Wilson would not allow Dale to discipline another subordinate when the subordinate spoke to Dale in a rude and disrespectful manner. Wilson also had what Dale considered to be an offensive sign in his office that said "Fear, sarcasm and intimidation are acceptable leadership traits when used in moderation." There were also times when Wilson would not allow Dale to manage her organization; told her peer managers he would be the approving official for anything she did; told another manager he could not wait to write

7

Dale's appraisal so he could hold her accountable; and would communicate with Dale only through email.

On March 18, 2003, as a result of Wilson's actions, Dale supplemented her EEO complaint with a claim of retaliation. Dale thought that, because she did not know Wilson until he became her supervisor, the only reason she could think of for his actions toward her was in retaliation for her November 2002 EEO complaint.

Dale became depressed about having to work in what she believed was a hostile-work environment. On March 13, 2003, she went on extended sick leave, during which time a clinical psychologist diagnosed her with "anxiety secondary to thoughts of returning to the workplace." In May 2003, even though her psychologist cleared Dale to return to work, Dale resigned because she could not handle the alleged harassment and retaliation she experienced at work.

8

## III.  DISCUSSION

Dale brings four claims against the Air Force Secretary: disparate-treatment disability discrimination, hostile-work environment, retaliation, and constructive discharge.  She brings disability-discrimination and hostile-work-environment claims based on Sykes's conduct towards her, and retaliation and constructive-discharge claims based on Wilson's conduct towards her.[5]  The court will address each of Dale's claims below.

### A.  Disparate-Treatment
### Disability Discrimination

Dale first contends that Sykes discriminated against her based on an erroneous perception that Dale's weight substantially limited her ability to perform as Chief of Business Operations; whereas, the Air Force Secretary denies Sykes perceived Dale as being disabled and that Sykes discriminated against her based on her weight.  The

_____

5.  At the pretrial held on April 5, 2007, Dale clarified her claims in this manner.

9

Secretary further argues that obesity is not a disability that is protected by the Rehabilitation Act.

The Rehabilitation Act of 1973 "prohibits federal agencies from discriminating in employment against otherwise qualified individuals with a disability." Mullins v. Crowell, 228 F.3d 1305, 1313 (11th Cir. 2000). Discrimination claims under the Rehabilitation Act are governed by the same standards used in cases brought under the Americans with Disability Act of 1990 ("ADA"), 42 U.S.C. §§ 12111-12117, 12203. Cash v. Smith, 231 F.3d 1301, 1305 (11th Cir. 2000). Accordingly, "[c]ases decided under the Rehabilitation Act are precedent for cases under the ADA and vice-versa." Id. at 1305 n.2.

The Rehabilitation Act covers a plaintiff whose employer regards her as being disabled, even if she does not have an actual disability. 29 U.S.C. § 705(20)(B)(3). In Sutton v. United Airlines, Inc., 527 U.S. 471, 489 (1999), in interpreting the ADA, the Supreme Court explained that a claim falls within the 'regarded as' category when either "(1) a[n employer]

10

mistakenly believes that a person has a physical impairment that substantially limits one or more major life activities, or (2) a[n employer] mistakenly believes that an actual, nonlimiting impairment substantially limits one or more major life activities." 527 U.S. at 489. "In both cases, it is necessary that a covered entity entertain misperceptions about the individual--it must believe either that one has a substantially limiting impairment that one does not have or that one has a substantially limiting impairment when, in fact, the impairment is not so limiting." Id. And, in both of the two Sutton categories, the perceived physical impairment must be one that is covered under the Act. EEOC v. Watkins Motor Lines, Inc., 463 F.3d. 436, 441 n. 2 (6th Cir. 2006); Andrews v. State of Ohio, 104 F.3d 803, 807 (6th Cir. 1997); Francis v. City of Meriden, 129 F.3d 281, 285 (2d Cir. 1997).

Dale contends that, because she was overweight, Sykes regarded her as having a substantially limiting impairment that prevented her from performing as Business

Flight Chief.  It is unclear if Dale's allegations fall under the first or second <u>Sutton</u> category of a 'regarded as' claim.  Therefore, the court will analyze her disability-discrimination claim under both, beginning with the second.

    <u>Second Sutton category: An actual physical impairment that mistakenly is 'regarded as' substantially limiting one or more major life activities when it does not</u>:  In order for Dale to show that her obesity is a disability that Sykes mistakenly regarded as substantially limiting her major life activity of working, she needs to prove (1) she has a physical impairment as defined by the Rehabilitation Act; (2) Sykes knew of the impairment; and (3) Sykes mistakenly believed the impairment substantially limited one or more of Dale's major life activities when it did not.  See <u>Watkins Motor Lines</u>, 463 F.3d. at 441 n. 2.  Under the first element, therefore, Dale must show that her obesity is, in fact, a disability that is covered under the Rehabilitation Act.

A person is disabled under the Rehabilitation Act when she has a "physical or mental impairment which for such individual constitutes or results in a substantial impediment to employment." 29 U.S.C. § 705 (2)(A)(i); see also 42 U.S.C. § 12102(2)(A) (ADA) (containing similar language). The regulations implementing the Rehabilitation Act define a "physical impairment" as "any physiological disorder or condition, cosmetic disfigurement, or anatomical loss affecting one or more of the following body systems: neurological; musculoskeletal; special sense organs; respiratory, including speech organs; cardiovascular; reproductive, digestive, genito-urinary; hemic and lymphatic; skin; and endocrine." 45 C.F.R. § 84.3 (j)(2)(i)(A). The Equal Employment Opportunity Commission ("EEOC") regulations implementing the ADA further explain that "[t]he definition of impairment does not include physical characteristics such as eye color, hair color, left-handedness, or height, weight or muscle tone that are within 'normal' range and are not the result

13

<u>physiological disorder</u>."    29 C.F.R. pt 1630, App.
§ 1630.2(h) (emphasis added).    Further, "except in rare
circumstances, obesity is not considered a disabling
impairment."  29 C.F.R. pt 1630, App. § 1630.2(j)).

Based on the aforementioned definitions of
'impairment,' in order for obesity to be covered under
the Rehabilitation Act, it must be based on a
physiological disorder.  <u>See, e.g.</u> <u>Watkins Motor Lines</u>,
463 F.3d at 443 ("to constitute an ADA impairment, a
person's obesity, even morbid obesity, must be the result
of a physiological condition"); <u>Francis</u>, 129 F. 3d 281,
286 (2nd Cir. 1997) ("obesity, except in special cases
where the obesity relates to a physiological disorder, is
not a 'physical impairment' within the meaning of the
[ADA]"); <u>Coleman v. Georgia Power Co.</u>, 81 F. Supp. 2d
1365, 1368 (N.D. Ga. 2000) (Evans, J. ) ("in order for
obesity to be an [ADA] impairment it must not only affect
a bodily system but must also result from a physiological
condition").

Dale has not offered any evidence that her obesity was linked to a physiological disorder.  In the pre-trial conference held on April 5, 2007, counsel for Dale conceded that she has no medical documentation of a physiological disorder, and, indeed, counsel stated that Dale does not contend that she has a physiological disorder.  The court therefore finds that Dale's obesity is not a disability covered under the Rehabilitation Act. See, e.g. Watkins Motor Lines, 463 F.3d at 443; Francis, 129 F. 3d at 286; Coleman, 81 F. Supp. 2d at 1368. Because Dale cannot meet the first element under the second category of a 'regarded as' claim, Dale's disparate-treatment disability-discrimination claim under the second Sutton category fails.

First Sutton category: Mistakenly 'regarded as' having a physical impairment that substantially impairs one or more major life activities: To recover under this first Sutton category, Dale must not only show that Sykes perceived her as being impaired because of her weight when, in fact, she has no impairment at all, she must

15

also still prove that the mistakenly perceived impairment is one covered under the Rehabilitation Act.  <u>See</u> <u>Francis</u>, 129 F.3d at 284 ("an individual is covered by the 'regarded as' prong of the definition of disability in the ADA and the [Rehabilitation Act] if he has none of the impairments defined in the definition of the term 'impairment' but is treated by a covered entity as having a substantially limiting impairment.") (internal quotations and citations omitted).  In other words, under the first category of the 'regarded as' claim, Dale must show that she was perceived to have not just a weight-related disorder, but a physiologically-based weight-related disorder; thus, for example, if she were perceived by her employer as having a thyroid disorder that causes her weight problem, then arguably she would have a better chance of falling within the first category of a 'regarded as' claim.  Otherwise, her perceived impairment, albeit mistaken, is not physiologically-based and thus is not one covered by the Rehabilitation Act.

Dale has not offered any evidence to indicate that

Sykes perceived her as having a physiologically-based
weight problem. She only alleges that Sykes
discriminated against her because she perceived Dale as
being overweight or obese. Accordingly, Dale's claim
does not fall under the first <u>Sutton</u> category of a
'regarded as claim.' Dale's disparate-treatment
disability-discrimination claim fails again.

<u>McDonnell Douglas analysis</u>: Even if Dale had
presented sufficient facts to show that her obesity is
covered under the Rehabilitation Act, she still has not
sustained her claim for disparate-treatment disability
discrimination. In addressing claims of disparate-
treatment disability discrimination, the court applies
the well-known burden-shifting analysis laid out in
<u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792 (1973).
<u>Wascura v. South Miami</u>, 257 F.3d 1238, 1242 (11th Cir.
2001); <u>Hilburn v. Murata Elecs. N. Am., Inc.</u>, 181 F.3d
1220, 1226 (11th Cir. 1999). Under the <u>McDonnell Douglas</u>
burden-shifting analysis, if an employee successfully
makes out her prima-facie case, there is a rebuttable

presumption of illegal discrimination.  Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 254 (1981); Wascura, 257 F.3d at 1242.  The burden then shifts to the employer to articulate a legitimate, non-discriminatory reason for its employment action.  Id.  "However, the employers' burden is merely one of production; it 'need not persuade the court that it was actually motivated by the proffered reasons.'"  Wascura, 257 F.3d at 1242 (quoting Burdine, 450 U.S. at 255).  Once the employer satisfies this burden of production, "the presumption of discrimination is eliminated" and the employee must come forward with evidence that would be sufficient to convince a reasonable fact-finder that the reason given by the employer is pretextual.  Id.  "If the [employee] fails to proffer sufficient evidence to create a genuine issue of material fact as to whether each of the [employer]'s proffered reasons is pretextual, the [employer] is entitled to summary judgment."  Id.

Dale alleges that Sykes treated her differently from the way she treated other employees who were not

overweight.[6]  Dale provides a number of examples where Sykes singled her out or did not allow her to solve problems for herself.  In response, the Air Force Secretary has stated a number of legitimate non-discriminatory reasons for Sykes's actions, including that, while Sykes may have been hard on Dale, it was because Dale's department was losing money and Sykes was assigned to address the problems.  Dale has not offered sufficient evidence from which a reasonable factfinder could conclude that the reasons proffered by the Air Force Secretary are pretextual.  Consequently, Dale's disparate-treatment disability claim fails again.  See Wascura, 257 F.3d at 1242.


B.  Hostile-Work Environment

To establish a hostile-work-environment claim under the Rehabilitation Act, Dale must show that (1) she

_____

6.  Dale is not bringing a failure-to-accommodate disability-discrimination claim, which would be analyzed differently from a disparate-treatment disability-discrimination claim.  Holly v. Clairson Industries, L.L.C., ___ F.3d _____, 2007 WL 2050769 (11th Cir. 2007),

19

belongs to a protected group; (2) she was subject to unwelcome harassment; (3) the harassment was based on a protected characteristic; (4) the harassment was severe or pervasive enough to alter the terms and conditions of her employment and create a discriminatorily abusive working environment; and (5) the employer is either vicariously or directly responsible for the abusive environment. Miller v. Kenworth of Dothan Inc., 271 F.3d 1269, 1275 (11th Cir. 2002).    Dale cannot establish a prima-facie case for her hostile-work-environment claim because she cannot demonstrate that she belongs to a protected group--in this case, she does not have an actual or perceived impairment covered by the Rehabilitation Act.    Dale's hostile-work-environment claim fails.


        C.  Retaliation and Constructive Discharge

     Dale's third (retaliation) and fourth (constructive-discharge) claims are essentially the same: that Wilson retaliated against her for filing an EEO complaint by

constructively discharging her. Courts analyze retaliation claims under the same McDonnell Douglas burden-shifting analysis described previously. Stewart v. Happy Herman's Cheshire Bridge, Inc., 117 F.3d 1278, 1287 (11th Cir. 1997). To demonstrate a prima-facie case of retaliation under the Rehabilitation Act, a plaintiff must show that: (1) she was engaged in statutorily protected activity under the Rehabilitation Act; (2) she suffered an adverse-employment action; and (3) there is a causal connection between the protected conduct and the adverse-employment action. See Parris v. Miami Herald Publ'g Co., 216 F.3d 1298, 1301 (11th Cir. 2000); Brochu v. City of Riviera Beach, 304 F.3d 1144, 1155 (11th Cir. 2002).

Dale satisfies the first element of a prima-facie case for her retaliation claim, because she engaged in statutorily protected activity when she filed a formal EEO complaint alleging disability discrimination and hostile-work environment. Under the second element, Dale must show that she suffered an adverse-employment action.

In this case, Dale contends that the adverse-employment action against her was a constructive discharge . E.g., Akins v. Fulton County, 420 F.3d 1293, 1300-01 (11th Cir. 2005) ("Constructive discharge ... constitutes an adverse employment action").    Dale alleges that Wilson's treatment of her when she returned from sick leave led to her constructive discharge.

To establish constructive discharge, Dale must prove that working conditions were "so intolerable that a reasonable person in [her] position would have been compelled to resign." Griffin v. GTE Florida, Inc., 182 F.3d 1279, 1283 (11th Cir. 1999); Doe v. Dekalb County Sch. Dist., 145 F.3d 1441, 1450 (11th Cir. 1998).  This standard is so high that the plaintiff "must demonstrate a greater severity or pervasiveness of harassment than the minimum requirement to prove a hostile working environment." Hipp v. Liberty National Life Insurance Co., 252 F.3d 1208, 1231 (11th Cir. 2002).

Dale has not offered enough evidence for a reasonable factfinder to conclude that Wilson's behavior towards her

rose to the level of a constructive discharge.  In fact, for many of Dale's complaints, the Air Force Secretary proffers several legitimate, non-discriminatory and non-retaliatory reasons for Wilson's behavior, and Dale has failed to produce sufficient evidence that any one of them is pretextual.  see, e.g. Wascura, 257 F.3d at 1242 ("If the [employee] fails to proffer sufficient evidence to create a genuine issue of material fact as to whether each of the [employer]'s proffered reasons is pretextual, the [employer] is entitled to summary judgment."). First, Dale complains that, when she returned to work, Wilson barely acknowledged her presence at their first meeting and dismissed her until later in the day, and that, when they met again that same day, Wilson was very short with Dale and told her not to make any personnel changes for 90 days; Wilson, however, responds that he instructed Dale in that matter to ensure that there were no personnel changes while he waited for the results of some new actions he took to boost the business. Secondly, Dale complained that Wilson would not let her

reprimand a subordinate for being rude to her; in response, Wilson said that he advised Dale not to reprimand the subordinate for missing a meeting (because the employee had the wrong meeting time), but that Dale could make the ultimate decision on whether to reprimand the employee for being rude.  Third, Dale complained that Wilson spoke directly to her subordinates instead of coming to her first; Wilson responds that he was used to speaking directly to her subordinates from when she was on sick leave.  The remainder of Dale's allegations against Wilson include Dale being offended by a sign in his office that said "Fear, sarcasm and intimidation are acceptable leadership traits when used in moderation," Wilson telling her peer managers that he would be the approving official for anything she did, and Wilson telling people that he could not wait to evaluate her; however, these are all actions that reasonably relate to the responsibility of a manager towards his subordinate. see McCoy v. Macon Water Auth., 966 F. Supp. 1209, 1221 (M.D. Ga. 1997) (Lawson, J.) ("it is not harassment for

supervisors to monitor the performance of their employees"). Consequently, Dale's allegations against Wilson do not rise to the level of creating a constructive discharge. Without demonstrating that she was constructively discharged, Dale has not suffered an adverse-employment action.

As to the third element for a prima-facie case (a causal connection between the filing of her EEO complaint and the adverse-employment action), the only evidence that Dale has offered as proof of a causal connection is her own statement that "Wilson's actions and attitude toward [her] were totally unexplainable, absent retaliation," and "the only reason [she] can think of for his actions toward her is retaliation for her EEO complaint." Pf. Resp. Sum. Jud. ¶47. Dale's speculation is hardly enough to show a causal connection for retaliation.

Nevertheless, while not argued by Dale, a causal connection can be established by the temporal proximity of the filing of her EEO complaint on November 26, 2002,

and the allegedly adverse-employment action, beginning
with Wilson's treatment of her when she returned to work
on January 13, 2003.  <u>See</u> <u>Higdon v. Jackson</u>, 393 F.3d
1211, 1220 (11th Cir. 2004) (in the absence of other
evidence of causation, close temporal proximity may be
sufficient to show that the protected activity and the
adverse action were causally connected).  Although such
temporal proximity must be "very close," <u>Clark County
Sch. Dist. v. Breeden</u>, 532 U.S. 268 (2001), one month
between the protected expression and the allegedly
adverse action is not too distant, <u>Higdon</u>, 393 F.3d at
1220.  In this case, there were approximately six weeks
between the time Dale filed her EEO complaint and when
Wilson allegedly began to treat her adversely.  In this
instance, a six-week gap is enough to show temporal
proximity, particularly because Dale's return to work was
the first opportunity Wilson had to retaliate against
her.  <u>See</u> <u>Porter v. Cal. Dep't of Corr.</u>, 419 F.3d 885,
895 (9th Cir. 2005) (the years between the plaintiff's
protected activity and the adverse-employment actions did

not defeat a finding of a causal connection where the
defendant did not have the opportunity to retaliate until
he was given responsibility for making personnel
decisions); Ford v. GMC, 305 F.3d 545, 554-55 (6th Cir.
2002) (finding a causal connection although there was a
five-month gap between the protected activity and the
adverse-employment actions because the plaintiff was
under the control of a different supervisor during the
gap).

Although Dale has failed to establish the second
element for a prima-facie case of retaliation, the court,
so as to provide a complete analysis, will assume that
she has provided sufficient evidence to support a prima-
facie case of retaliation and will move to the final
stage of the McDonnell Douglas analysis: whether the Air
Force Secretary has proffered legitimate, non-retaliatory
reasons for Wilson's adverse-action and whether Dale has
produced sufficient evidence for a reasonable factfinder
to conclude that these reasons are pretextual. See, e.g.
Sullivan v. AMTRAK, 170 F.3d 1056, 1059 (11th Cir. 1999)

("Once the plaintiff makes out a prima facie case, the burden shifts to the defendant to rebut the presumption of retaliation by producing legitimate reasons for the adverse employment action."); <u>Carter v. City of Miami</u>, 870 F.2d 578, 584 (11th Cir. 1989) (an employer may rebut a prima facie case of retaliation with evidence of a legitimate nondiscriminatory purpose, which the employee must then prove by "significantly probative evidence" to have been pretextual). As outlined in the preceding constructive-discharge discussion, the Air Force Secretary has offered several legitimate, non-retaliatory and non-discriminatory reasons for Wilson's actions, and Dale has not produced sufficient evidence from which a reasonable factfinder could conclude that these reasons are pretextual. Dale's retaliation claim therefore fails.

## IV.  CONCLUSION

For the foregoing reasons, the Air Force Secretary's motion for summary judgment will be granted.  An appropriate judgment will be entered to that effect.

DONE, this the 24th day of July, 2007.

                       <u>   /s/ Myron H. Thompson   </u>
                       UNITED STATES DISTRICT JUDGE